**Opinion issued May 9, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00882-CV

————————————

**CONCIERGE NURSING CENTERS, INC. AND
HOUSTON CONCIERGE CARE, L.P., Appellants**

**V.**

**ANTEX ROOFING, INC., NEVCO WATERPROOFING,
INC., CONEX CONSTRUCTORS, INC., AND
MITCHELL CHUOKE PLUMBING, INC., Appellees**

---

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Case No. 2008-64390**

---

## O P I N I O N

In this contract action, property owners Concierge Nursing Centers, Inc. and

Houston Concierge Care, L.P. (collectively, "Concierge") appeal from the trial

court's summary judgment in favor of four construction subcontractors. In a single issue, Concierge contends that the subcontractors were not entitled to summary judgment on its contractual indemnity claims against them. We reverse the judgment and remand for further proceedings.

## Background

After discovering water damage and resulting mold in its newly constructed facility, Concierge sued the construction project's general contractor, Brae Burn Construction Company, Ltd., and its subcontractors Antex Roofing, Inc.; Nevco Waterproofing, Inc.; Conex Constructors, Inc.; and Mitchell Chuoke Plumbing, Inc. In that lawsuit, Concierge ultimately settled its claims against Brae Burn and nonsuited its claims against the subcontractors. In Concierge's settlement agreement with Brae Burn, Brae Burn assigned to Concierge all of Brae Burn's contractual rights against the subcontractors.

Brae Burn's subcontracts with the subcontractors contain two indemnity provisions. The parties disagree about the meaning of the word "property" in the first paragraph:

> 6.1 Subcontractor hereby agrees with Contractor to defend, indemnify and hold harmless Contractor, Owner, Architect, and all parties claiming by, through or under Contractor, Owner, or Architect (hereafter referred to as the "Indemnified Parties") from all claims, suits, actions and proceedings (WHETHER ARISING UNDER NEGLIGENCE, WARRANTY, CONTRACT, STRICT LIABILITY, PRODUCTS LIABILITY, COMPARATIVE NEGLIGENCE OR FAULT, OR OTHER THEORY OF ACTION, the foregoing being

2

collectively referred to as "Claims") whatsoever which may be instituted on account of injuries to or death of persons or *damage to property* caused or alleged to have been caused in connection with the performance by Subcontractor of the work or any extra work or in any way related to the acts, conduct, or condition created by or on behalf of the Subcontractor with respect to the premises or project upon which the Work is being performed, and all losses, costs, damages and expenses resulting therefrom, including but not limited to attorney's fees and other costs of defending against the Claims, regardless of whether the claim was caused in part by any of the Indemnified Parties. . . . SUBCONTRACTOR'S DUTY TO INDEMNIFY EXTENDS TO CLAIMS CAUSED BY NEGLIGENCE OR FAULT OR LIABILITY UNDER ANY THEORY OF ACTION OF AN INDEMNIFIED PARTY, BUT NOT FROM THE SOLE NEGLIGENCE OR SOLE FAULT OR SOLE LIABILITY OF AN INDEMNIFIED PARTY. SUBCONTRACTOR'S DUTY TO INDEMNIFY EXTENDS TO ACTIONS FOR DAMAGES ON ACCOUNT OF INJURY TO OR DEATH OF AN EMPLOYEE OF SUBCONTRACT.

(Italics added for emphasis).[1] A definition for the word "property" appears

in the following paragraph:

---

[1] The text we have redacted—the second and third sentences in the paragraph—addresses the subcontractors' other indemnity-related duties. While those sentences are not directly relevant here, we quote them below because they do provide some guidance on the structure of the contract and the proper interpretation of the word "property" as used in paragraph 6.1:

Subcontractor shall assume on behalf of the Indemnified Parties and conduct with due diligence and in good faith the defense of all claims, regardless of whether the claim is meritorious or whether any Indemnified Party is joined therein, and shall bear the cost of all judgments and settlements in connection therewith; provided however, without relieving the Subcontractor of its obligation hereunder, any of the Indemnified Parties, at its election, may defend or participate in the defense of any or all of the Claims. Neither the maintenance

6.2 *"Property" means any tangible personal property including equipment, tools, material, and scaffolding and ladders, in which a subcontractor has an ownership or possessory interest.* Use by a subcontractor includes use by an employee of Subcontractor or by [a] person or organization under contract with Subcontractor. In the event that a subcontractor ("using subcontractor") uses the *property of another subcontractor* ("owning subcontractor"), then the using subcontractor SHALL INDEMNIFY AND HOLD HARMLESS the owning subcontractor from any claim or cause of action arising out of the use of the property by the using subcontractor. THIS INDEMNITY SHALL INCLUDE ANY CLAIM WHICH ALLEGES NEGLIGENCE OR STRICT LIABILITY ON THE PART OF THE OWNING SUBCONTRACTOR AS TO THE DESIGN, USE, OR CONDITION OF THE PROPERTY. THIS INDEMNITY SHALL COVER CLAIMS AND CAUSES OF ACTION OF THE EMPLOYEES OF THE USING SUBCONTRACTOR.

(Italics added for emphasis). One of the subcontracts, Antex's subcontract, also includes a handwritten delineation adding the word "tangible" to paragraph 6.1, so that it reads: "damage to [tangible] property."

After settling with Brae Burn, Concierge initiated against the subcontractors a second suit, which is the basis of this appeal. Concierge sued the subcontractors as Brae Burn's assignee, asserting contract claims based on the subcontractors' failure to indemnify and defend Brae Burn against Concierge's claims in the earlier

---

of the insurance referred to in Section V hereinabove nor the limits referred to therein shall diminish Subcontractor's obligations hereunder or Subcontractor's duties of indemnification to contractor elsewhere in this Subcontract.

4

suit.[2] Each of the subcontractors moved for summary judgment, and the trial court granted the motions and ordered that Concierge take nothing. This appeal followed.

## Standard of Review

We review summary judgments de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We consider the summary judgment evidence in the light most favorable to the nonmovant. *Mann Frankfort Stein*, 289 S.W.3d at 848. The subcontractors were entitled to traditional summary judgment on Concierge's claims against them if they conclusively negated at least one essential element of the claims or conclusively established each element of an affirmative defense to the claims. *See* TEX. R. CIV. P. 166a(c); *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010). They were entitled to no-evidence summary judgment on Concierge's claims against them if, after adequate time for discovery, the subcontractors challenged Concierge's evidence to support one or more elements of Concierge's claims and Concierge failed to produce summary judgment evidence raising a genuine issue of material fact on the

---

[2] The subcontracts also contained provisions requiring the subcontractors to name Brae Burn as an additional insured. Concierge asserted breach of contract claims based on this provision, but it does not appeal from the trial court's judgment with respect to those claims.

challenged elements. *See* TEX. R. CIV. P. 166a(i); *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006) (per curiam).

Because the trial court's judgment and orders do not specify the grounds on which it granted summary judgment on Concierge's indemnity claims, Concierge must demonstrate that none of the proposed grounds are sufficient to support the judgment. *See Rogers v. Ricane Enters.*, 772 S.W.2d 76, 79 (Tex. 1989); *West v. SMG*, 318 S.W.3d 430, 437 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Conversely, we will affirm the judgment if any of the theories advanced in the summary judgment motions is meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004); *West*, 318 S.W.3d at 437.

## Assignment of Brae Burn's Indemnity Claims

### A. The parties contentions and pertinent background

Three of the four subcontractors contended in their summary judgment motions that Concierge—who purportedly acquired Brae Burn's indemnity claims against the subcontractors by an assignment in the settlement agreement among Concierge, Brae Burn, and an insurer, Hartford Fire Insurance Company—actually acquired no cause of action because Brae Burn no longer had a cause of action to

6

assign at the time.[3] Before the events giving rise to this litigation, Brae Burn had two commercial general liability insurance policies; AIG issued one and St. Paul issued the other. The AIG policy contains a provision explaining the company's subrogation rights: "If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us." The St. Paul policy also contains a subrogation provision: "Any person protected under this policy may be able to recover all or part of a loss from someone other than us. . . . If we make a payment under this policy that right of recovery will belong to us."

Under the settlement agreement between Concierge and Brae Burn, National Union Fire Insurance Company of Pittsburgh, PA was to pay to Concierge $3 million on behalf of Hartford. Although the record does not reflect the precise relationships among AIG, St. Paul, Hartford, and National Union, Concierge admitted in a response to interrogatories that "[a] total of $3,000,000 was paid in settlement by both insurers, AIG and St. Paul." Thus, the parties do not dispute that

---

[3]      Nevco, Conex, and Mitchell Chuoke argued about unassignability in their respective summary judgment motions; Antex did not.

        Nevco, Conex, and Mitchell Chuoke argued in the traditional part of their summary judgment motions that the insurance policies demonstrated the ineffectiveness of the purported assignment. Thus, it was their burden as summary judgment movants to prove that the subrogation clauses operated to nullify the assignment. See TEX. R. CIV. P. 166a(c). They also argued in the no-evidence part that Concierge had no proof of a valid assignment. Thus, it was Concierge's burden as the nonmovant to produce evidence that it received a valid assignment. See TEX. R. CIV. P. 166a(i).

7

the $3 million payment specified in the settlement agreement was made under the AIG and St. Paul insurance policies.

The subcontractors argue that "pursuant to Brae Burn's insurance contracts, once AIG and/or St. Paul paid settlement funds on behalf of Brae Burn in the underlying lawsuit, any rights Brae Burn may have had to recover those payments from third-parties (i.e. its subcontractors) automatically transferred to AIG and St. Paul." Therefore, they argue, "AIG and St. Paul, not Brae Burn, owned the contractual claims against Brae Burn's subcontractors at the time Brae Burn attempted to assign them to" Concierge. Consequently, "Brae Burn's alleged assignment to [Concierge] of Brae Burn's contractual claims against its subcontractors was ineffective."

Concierge advances three grounds to support the validity of Brae Burn's assignment.[4] First, it contends that either a subrogee or a subrogor may maintain

---

[4] Besides the three grounds we identify, Concierge also relies on evidence that the insurers assigned to it all causes of action that the insurers had acquired from Brae Burn via subrogation. The evidence, a one-page document entitled "INSURER'S ACKNOWLEDGMENT AND WAIVER OF SUBROGATION RIGHTS" and signed only by National Union, was attached to Concierge's motion to reconsider the order granting partial summary judgment. The subcontractors argue that this evidence "was never made part of the summary judgment record and cannot be considered on appeal." We do not reach the issue of whether we may consider this document, as the issue is unnecessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1. For the purposes of this appeal only, we will assume, without deciding, that this evidence was not part of the summary judgment record.

8

the cause of action that is subject to the subrogation. By this argument, Concierge apparently contends that Brae Burn as the subrogee legally has the right to assign its causes of action to Concierge despite the language in the subrogation clauses. Second, Concierge contends that the contractual rights and remedies between the insurers (as subrogees) and their insured (as subrogor) are private in nature, and the subcontractors as third parties "are not entitled to the benefit of any arrangements made between Brae Burn and its subrogated insurer(s)." Third, Concierge contends that when "the insurers" executed the settlement agreement, they assented to Brae Burn's assignment of its claims to Concierge.

We agree that the subrogation respecting Brae Burn's contract claims does not prevent assignment of those claims to Concierge. When AIG and St. Paul (as subrogees) acquired their respective rights to recover payments made under the insurance policies, Brae Burn (as subrogor) retained the original claim. In other words, the subrogation provisions in this case do not contemplate a complete transfer of Brae Burn's *claims* to the insurers. Rather, each policy contemplates the transfer of *rights to recover* from a liable third-party up to the amount the insurer paid under the policy. Thus, Brae Burn retains the original contract claims burdened by the insurers' subrogation rights; the subcontractors have not brought to our attention a valid prohibition against the assignment of these claims.

9

## B.     Language and structure of the insurance policies

The insurance policies at issue contain written subrogation provisions. Therefore, as between Brae Burn and its insurers, the subrogation rights arising from the policies are governed by these provisions. *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 650–51 (Tex. 2007). We interpret insurance policies according to the rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Thus, they are construed from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

The language and structure of the policies indicate that AIG and St. Paul acquired rights to recover payments made under the insurance policies as opposed to Brae Burn's entire claims. In section O of the AIG policy, subsection 1 states that "[i]f any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us." The term "those rights" apparently references the preceding term "rights to recover all or part of any payment we have made." Thus, this provision contemplates the transfer of the right to recover up to the amount AIG paid under the policy, not the transfer of an entire claim. Subsection 2, concerning the order in which recoveries are to be applied, confirms this interpretation:

Any recoveries shall be applied as follows:

a. any person or organization, including the Insured, that has paid an amount in excess of the applicable Limits of Insurance of this policy will be reimbursed first;

b. we then will be reimbursed up to the amount we have paid; and

c. lastly, any person or organization, including the Insured that has paid an amount over which this policy is excess is entitled to claim the remainder.

This provision contemplates that if AIG obtains a recovery, other parties—including the insured—may have rights to part or all of the recovery proceeds. If subclause a applies, AIG's right to recover proceeds under subclause b is subordinate to the rights of the parties identified in subclause a. The AIG subrogation provision thus provides that AIG has certain rights to recover payments made under the policy, but it does not transfer all of Brae Burn's rights in its claims.

The St. Paul subrogation provision likewise does not contemplate a complete transfer of Brae Burn's claims. It states in pertinent part:

Any person protected under this policy may be able to recover all or part of a loss from someone other than us. Because of this, each protected person must do all that's possible after a loss to preserve any right of recovery available. If we make a payment under this policy that right of recovery will belong to us. If we recover more than we've paid, the excess will belong to the person who had the loss.

The term "that right of recovery" apparently references the right "to recover all or part of a loss from someone other than us." Read in isolation, the sentence—"If we

11

make a payment under this policy that right of recovery will belong to us"—could be understood to mean that the entire claim is transferred. The following sentence belies this interpretation, however, because it provides that if St. Paul recovers more than it paid under the policy, it must pay the excess to the person who had the loss. Thus, like the AIG policy, the St. Paul policy contemplates a transfer of a right of recovery up to the amount the insurer paid under the policy rather than a complete transfer of a claim.

## C.     Business activity served by the insurance policies

The "particular business activity sought to be served" by the policies, *Frost Nat'l Bank*, 165 S.W.3d at 312, bolsters our interpretation of the subrogation provisions. "The principal purpose of an insurance contract is to protect the insured from loss, thereby placing the risk of loss on the insurer." *Esparza v. Scott and White Health Plan*, 909 S.W.2d 548, 551 (Tex. App.—Austin 1995, writ denied) (citing *Ortiz v. Great S. Fire and Cas. Ins. Co.*, 597 S.W.2d 342, 344 (Tex. 1980)). In an insurance arrangement, the insurer assumes the risk that a loss may occur in exchange for a premium payment. *In re Tex. Ass'n of Sch. Bds., Inc.*, 169 S.W.3d 653, 658–59 (Tex. 2005) (orig. proceeding) (citing MURRAY ON CONTRACTS § 105(C), at 663 (4th ed. 2001)). In this way, insurance companies are in the business of spreading losses across the premiums they receive. *See id.*

Insurers may have either "contractual" subrogation rights, which arise from contract language, or "equitable" subrogation rights, which exist in equity to prevent the insured from receiving a double recovery to the insurer's detriment. *See Fortis Benefits*, 234 S.W.3d at 645, 647. Either way, "the principle of subrogation provides that once an insured is made whole from his damages, the insurer that has paid for the insured's covered losses is entitled to the insured's rights and remedies against a third party for the covered losses." *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 78 (Tex. App.—Austin 2008, no pet.). Thus, subrogation operates to reduce the insurer's risk and boost its solvency. *See Fortis Benefits*, 234 S.W.3d at 650 n.53. Subrogation is not intended to place the insurer in a position to profit from the loss. *See In re Tex. Ass'n of Sch. Bds.*, 169 S.W.3d at 659 (observing that "both parties hope that the condition [triggering coverage] will never occur") (quoting MURRAY ON CONTRACTS § 105(C), at 663).

"Generally, rights conferred by subrogation are entirely derivative of the subrogor's interests, to which the subrogee merely succeeds." *Guillot v. Hix*, 838 S.W.2d 230, 232 (Tex. 1992). When an insurer pays out on its insured's loss, it becomes a "pro tanto owner" of the cause of action. *Thoreson v. Thompson*, 431 S.W.2d 341, 347 (Tex. 1968); *Warwick Towers Council of Co-Owners v. Park Warwick, L.P.*, 298 S.W.3d 436, 439 (Tex. App.—Houston [14th Dist.] 2009, no pet.). This means that the insurer receives "the rights of its insured to the extent of

payments made under the insurance contract." *Rushing v. Int'l Aviation Underwriters, Inc.*, 604 S.W.2d 239, 243 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.); *see also* 16 COUCH ON INSURANCE § 223:85 (3d ed. 1995) ("[B]ecause an insurer's right of subrogation is merely derivative from that of the insured, the recovery by an insurer cannot exceed the amount to which the insured would be entitled."). Although the insurer, as subrogee, has a right to recover, there is still but one cause of action, that of the insured, whose ownership rights are burdened by the insurer's right to recoup payment made. *Guillot*, 838 S.W.2d at 232 (discussing principle in context of Workers' Compensation Act). Thus, the insurer as subrogee does not own the entire claim as if the claim were wholly transferred by an assignment; it has only the right to recover an amount equal to its payment under the insurance policy. *See Rushing*, 604 S.W.2d at 244 ("Any money recovered by the insurer in excess of that which the insurer has expended must be remitted to the insured."); 16 COUCH ON INSURANCE § 222:53 (contrasting subrogation, which "is a designation of proceeds recovered from a wrongdoer," with assignment, which "transfers the entire cause of action to the insurer").

When the AIG and St. Paul subrogation provisions are considered in light of these general insurance and subrogation principles, it is even more apparent that the provisions are not intended to transfer entire claims, but rather they transfer certain rights to recover payments made under the policies. Thus, the insured, Brae

Burn, retains the original claim which is burdened by the insurers' rights to recover payment.

**D.     After subrogation, Brae Burn's claims are assignable**

The settlement agreement among Concierge, Brae Burn, and Hartford contains this provision, entitled "Additional Consideration":

> For further consideration, Brae Burn hereby agrees to assign to [Concierge] all contractual claims it possesses against any third parties. Brae Burn hereby represents and warrants that such claims have not previously been assigned to any third parties.

The word "assign" or "assignment" in its most general sense means the transfer of property or some right or interest from one person to another. *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 113 (Tex. App.—Houston [14th Dist.] 1996, no writ). "It is the act by which one person transfers to another or causes to vest in another, his right or property or an interest therein, and unless it is qualified in some way, it is a transfer of one's *whole* interest." *Id.* (emphasis in original). Thus, the "Additional Consideration" clause, which is unqualified, operates to transfer from Brae Burn to Concierge "all contractual claims it possesses against any third parties," such as the subcontractors.

The subcontractors argue that by operation of the contractual subrogation provisions, Brae Burn did not own the contract claims it purportedly assigned to Concierge. However, as we discussed above, after subrogation Brae Burn retains a claim that is burdened by the insurers' rights to recover payment. As a general rule,

15

causes of action are freely assignable. *State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 707 (Tex. 1996); *Delaney v. Davis*, 81 S.W.3d 445, 448 n.4 (Tex. App.—Houston [14th Dist.] 2002, no pet.). While Brae Burn could not assign greater rights than it had, the subcontractors have not brought to our attention a valid prohibition against this assignment. *See John H. Carney & Assocs. v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, 354 S.W.3d 843, 849–50 (Tex. App.—Austin 2011, pet. denied) (observing that "general rule" of assignability applies "unless assignment is prohibited by statute or is contrary to public policy").

To be clear, we do not adjudicate here what subrogation rights, if any, the insurers have against Concierge, Brae Burn, or the subcontractors. The only question examined is whether Brae Burn's claims were unassignable solely because they were subject to the insurers' purported subrogation rights. To that extent only, we hold that the subcontractors did not meet their traditional summary judgment burden to prove that the assignment of Brae Burn's claims to Concierge was ineffective. Moreover, we hold that by presenting the settlement agreement in response to the summary judgment motions, Concierge met its burden to defeat the no-evidence part of the motions concerning the assignment of claims.

**The Parties' Indemnity Agreement**

Each of the subcontractors sought traditional summary judgment on Concierge's indemnity claims against them on the ground that, under the

16

subcontracts, they did not owe a duty to indemnify Brae Burn from Concierge's earlier lawsuit.

## A.    The parties' contentions

Concierge contends that the subcontractors breached the subcontracts by not providing a defense and indemnity in the original lawsuit. The subcontractors assert that they did not breach the subcontracts. According to the subcontractors, their indemnity obligations under the subcontracts extended only to claims for "injuries or death of persons or damage to property," with property being defined as "tangible personal property . . . in which a subcontractor has an ownership or possessory interest." Because the property damage at issue relates to damage to real property—not "tangible personal property"—in which the subcontractors have no ownership interest, the subcontractors contend that the claims fall outside the scope of the subcontracts' indemnity provisions and therefore there was no breach of contract.

Concierge responds that the subcontractors rely on a definition of "property" found in paragraph 6.2 of the subcontract, but that definition is limited to that paragraph and does not apply to the term "property" as used in paragraph 6.1, the paragraph on which Concierge relies for the subcontractors' alleged indemnity obligations. According to Concierge, paragraphs 6.1 and 6.2 "create two separate indemnity obligations with two separate purposes" and "the definition of

17

'property' found in paragraph 6.2 has no reasonable application to the indemnity obligation in paragraph 6.1." Concierge asserts that applying the definition of "property" provided in paragraph 6.2 to the use of the term "property" in paragraph 6.1 "would lead to absurd results."

## B.    The contractual definition of "property" in paragraph 6.1

Both parties contend that paragraph 6.1's indemnity provision is unambiguous, but they interpret the provision differently. We determine, as a matter of law, whether a contract is ambiguous. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). If we can give the contract's language a certain and definite meaning, the contract is not ambiguous, and we construe the contract as a matter of law. *Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012); *Dynegy Midstream Servs.*, 294 S.W.3d at 168. Our primary concern in construing a contract is to ascertain the intent of the parties as expressed in the instrument. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We give the contract's terms their "plain and ordinary meaning" unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs.*, 294 S.W.3d at 168; *Valence Operating*, 164 S.W.3d at 662. We construe a contract "according to what it says, not what [the contracting parties] thought it said." *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 745 (Tex. 2006) (construing insurance agreement); *see also Anglo-Dutch Petroleum Int'l, Inc. v.*

18

*Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) ("Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated."); *Union Pac. R.R. Co. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 421 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("We glean intent from what the parties said in their contract, not what they allegedly meant."). We look at the entire contract, rather than any single provision, in determining whether a particular term is ambiguous. *Henry v. Mason*, 333 S.W.3d 825, 844 (Tex. App.—Houston [1st Dist.] 2010, no pet.). A contract term is not ambiguous merely because the parties disagree as to its meaning. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981); *Houston Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 641 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see also GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 289 (Tex. App.—Houston [1st Dist.] 1997, writ denied) ("[T]he parties' interpretations of the contract are irrelevant if the meaning of the contract is plain from its face."). An agreement is ambiguous only if the two conflicting interpretations are both reasonable. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

Applying these principles, we hold that the word "property" as used in paragraph 6.1 has its ordinary meaning rather than the particular meaning used in paragraph 6.2. We reach this conclusion because the language, structure, and

apparent intent of the subcontracts unambiguously impose an indemnity obligation on the subcontractors for all property damage that occurs on the project or to the finished structure as a result of the subcontractors' performance. Paragraphs 6.1 and 6.2 of the subcontracts constitute all of section 6, and no other provision in the subcontract concerns indemnity obligations. While the definition of "property" in paragraph 6.2 does not expressly limit the definition to that paragraph, the structure of the contract does.

Unless otherwise limited, the indemnity obligation in section 6.1 plainly covers the alleged water damage to the Concierge. The word "property" ordinarily means "[t]hat which one owns; a thing or things belonging to or owned by some person or persons; a possession (usually material), or possessions collectively[.]" 12 OXFORD ENGLISH DICTIONARY 639 (2d ed. 1991). Structurally speaking, the narrow definition of "property" advocated by the subcontractors—that "property" only encompasses tangible property owned by other subcontractors—must be exported from paragraph 6.2 as it is not found in paragraph 6.1. The subcontract in its other uses of capitalizations to define terms always includes the definition immediately after the first use of the word or phrase in question and the defined term is thereafter used throughout the contract.[5] Other than the term "property,"

---

[5] For example, the subcontracts use capitalizations to define the words Contractor, Contract Documents, Subcontractor, and Work.

there is no term in the contract that is used in one provision but is expressly defined in a latter provision.[6]

Other parts of the subcontract use the word "property" in accordance with its ordinary meaning. The word "property" is first used in paragraph 3.2, which discusses liens filed "against the real property." In this paragraph, the ordinary definition of "property" is expressly modified through the insertion of the adjective "real." In contrast, the absence of the adjective "tangible" in paragarph 6.1 suggests that the ordinary definition is not modified. The word "property" next appears in section 5 of the subcontract, which addresses the parties' obligations regarding "property insurance" and sets forth the amounts of "Property Damage" to be covered by a comprehensive general liability policy and "Property Damage" to be covered by a comprehensive automobile liability policy. There is no contention that the word "property" in this section is limited to tangible personal property owned by other subcontractors.

We also note that the word "property" is not used in any paragraph after paragraph 6.2. Thus, there is no indication that the narrow definition of 6.2 was intended to apply outside this paragraph. And if the narrow definition cannot apply

---

[6] There are a few instances where the defined word is not capitalized in subsequent uses but the context makes it clear that the uncapitalized word retains the expressly defined meaning.

to subsequent contractual provisions, it is less reasonable to apply the narrow definition to the word's earlier uses.

We think it is unreasonable that in a fine-print boilerplate contract the subcontractor would read a narrow definition of the word "property" in paragraph 6.2 and impute that narrow definition back to the word in the preceding paragraph, particularly when the word "property" in 6.1 appears only once in a four-sentence, 519-word paragraph and it is separated from the defined word "property" in the next paragraph by three sentences and 372 words. A reasonable party reading 6.1 in this context is in a different position than it would be if the narrow definition had immediately followed in the next sentence or if a subsequent definition had explicitly stated that it applies to all prior uses of the term or to all uses in the contract. This is particularly true when the two paragraphs concern completely different indemnity obligations—the first of which is owed to the contractor (Brae Burn), the owner (Concierge), and the architect, while the second one is owed to other subcontractors and not to the contractor, owner or architect.

Moreover, the apparent general purpose of paragraph 6.1—which is to indemnify the general contractor for defects in the subcontractors' performance—supports imputing the ordinary definition of "property" to that term. Section 6.2 addresses only a narrow set of circumstances—in contrast to 6.1, which is broader

and more sweeping—so logically it also contains its own narrower definition of "property" that is unique to those circumstances.

If the definition of tangible personal property were exported into 6.1, the indemnity provision would essentially read: Subcontractor agrees to indemnify Contractor (and others) from all claims whatsoever which may be instituted on account of injuries to or death of persons or damage to tangible personal property in which a subcontractor has an ownership or possessory interest. The subcontractors offer no explanation for why the parties would agree that the subcontractors' indemnity obligation would be broad for death claims but narrow for property damage (i.e., be limited to damage to tools and equipment). The most significant property damage exposure in a construction contract is for claims to the constructed building, like the claims here. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly*, 727 S.W.2d at 530). The commercial purpose of an indemnity provision in a construction contract supports the conclusion that the ordinary definition of property must apply in section 6.1

The other provisions in the contract that describe the subcontractors' responsibilities are broad, not narrow, and reflect an intention to make the

23

subcontractors responsible for all aspects of their performance. Paragraph 1.3 provides, in pertinent part:

> Subcontractor agrees to be bound to Contractor by the Contract documents insofar as they relate in any way to the Work undertaken by the Subcontractor and to assume towards contractor, in connection with the Work covered by this Subcontract, all of the obligations and responsibilities which Contractor assumed under the Contract documents by any party.

Paragraph 2.2 provides:

> Subcontractor shall be liable for damages sustained by Contractor, which are caused by delay caused by Subcontractor and Subcontractor shall indemnify and save harmless Contractor from any liability for damages, liquidated or otherwise, caused by delay caused by Subcontractor and for which Contractor is liable to any other party under the Contract Documents.

These provisions lend further support that a narrow reading is not the proper interpretation of the subcontracts.

The subcontractors argue that the parties' intent to export paragraph 6.2's definition of "property" to paragraph 6.1 is evidenced in a delineation made by Antex Roofing in its subcontract; Antex, presumably, added the word "tangible" before the term "property" in paragraph 6.1. We disagree that this revision by Antex constitutes proof of the other subcontractors' intention for their respective subcontracts. On the contrary, this delineation indicates that Antex concluded the word "property" in paragraph 6.1 did not clearly utilize the narrow definition found in paragraph 6.2 without that modification. Furthermore, we may not affirm the

24

summary judgment for Antex on the basis of the delineation because Antex did not present this argument to the trial court in its summary judgment motion.

We hold that the trial court could not have granted the subcontractors summary judgment on Concierge's indemnity claims on the ground that, under the subcontracts, they did not owe a duty to indemnify Brae Burn from Concierge's earlier lawsuit.

### Evidence on Breach of the Indemnity Agreement

Finally, the subcontractors contend that Concierge produced no evidence of a breach of the indemnity agreement, that is, evidence that their conduct caused water damage or mold. More specifically, they assert that the original petition in the underlying lawsuit brought by Concierge against Brae Burn is insufficient to create a duty to indemnify and that the evidence offered in response to their summary judgment motions—the affidavit of Concierge's expert, Mark Stanford— constituted no evidence because it was conclusory. According to the subcontractors, Stanford failed "to explain or make any causal link between [the subcontractors'] work on the project and the alleged mold and water damage." They also contend that the trial court "determin[ed] that Mr. Stanford's affidavit was conclusory."

Contrary to the subcontractors' contentions, the trial court did not rule that Stanford's affidavit was conclusory. None of the subcontractors filed any objection

25

to Stanford's affidavit, and the record does not reflect an order striking the affidavit in whole or in part. Furthermore, we disagree with their assessment of the affidavit as conclusory.

In the summary judgment context, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." TEX. R. CIV. P. 166a(f). Conclusory statements in affidavits are "incompetent to support the rendition of summary judgment as a matter of law[.]" *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (per curiam, op. on rehearing). "Conclusory" means "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 n.32 (Tex. 2008) (quoting BLACK'S LAW DICTIONARY 308 (8th ed. 2004)). Thus, to be competent summary judgment evidence, affidavit statements regarding causation must be supported by underlying facts. *See LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688–89 (Tex. 2006) (per curiam); *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 803 (Tex. 2004).

According to the affidavit produced by Concierge to defeat the no-evidence summary judgment motions, Stanford is the owner of Stanford Consulting & Construction, which constructs and remodels buildings and provides consulting

26

services. Stanford averred that he inspected the Concierge and reviewed the construction documents, "numerous depositions" taken in this case, inspection reports, reports by the parties' experts, photographs, and depositions taken in the underlying lawsuit between Concierge and Brae Burn. Stanford stated that the construction documents required the building to be constructed in accordance with the Uniform Building Code, which "requires that a building be constructed so that water is not able to penetrate into the building envelope." This obligation was breached because water "did penetrate into the building envelope." Moreover, mold "occurred because of water intrusion at the facility." The water penetration occurred in areas where the roof was constructed (Antex Roofing) and where landscaping was installed (Conex Constructors); the rubber membranes around the window openings were not properly installed (Nevco Waterproofing); and plumbing intrusions were left unsealed (Mitchell Chuoke Plumbing). "But for these subcontractors' failure to perform their work in accordance with [the] Uniform Building Code and ensure that water would not penetrate into the building envelope, there would have been no water intrusion as a result of these subcontractors' work."

We reject the subcontractors' contention that Stanford's affidavit was conclusory and therefore no evidence. The affidavit explains the facts underlying the cause of the water damage and the mold. None of the subcontractors have

27

identified any details omitted from the affidavit that are essential to demonstrate causation. Accordingly, the trial court could not have granted summary judgment on the ground that the affidavit's statements were conclusory and thus constituted no evidence of the subcontractors' breaches.

## Conclusion

We hold that the trial court erred in granting summary judgment in favor of Antex, Nevco, Conex, and Mitchell Chuoke. Accordingly, we reverse the trial court's judgment and remand for further proceedings.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

28