

# NUMBER 13-18-00186-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**INTERNATIONAL PAPER COMPANY,** **Appellant,**

**v.**

**SIGNATURE INDUSTRIAL SERVICES, LLC**
**AND JEFFRY M. OGDEN,** **Appellees.**

### On appeal from the 60th District Court
### of Jefferson County, Texas.

# MEMORANDUM OPINION
**Before Chief Justice Contreras and Justices Benavides and Perkes**
**Memorandum Opinion by Justice Benavides**

By eleven issues, appellant International Paper Company (IP) challenges the jury's

verdict awarding damages to appellees Signature Industrial Services, LLC (Signature)

and Jeffry Ogden. IP's first five issues challenge Signature's claims and allege: (1-3)

Signature failed to present legally sufficient evidence for its breach-of-contract, fraud, and

promissory estoppel claims; (4) legally insufficient evidence supports Signature's

consequential damages award; and (5) a new trial should be granted because the jury awarded excessive actual damages to Signature. IP's next three issues relate to Ogden's claims and allege: (6) judgment should be rendered for IP on Ogden's breach-of-contract claim because Ogden was neither a party to nor a third-party beneficiary to the contract between Signature and IP; (7) the evidence is legally or factually insufficient to support Ogden's fraud claim; and (8) Ogden's claim for mental anguish damages is not supported by legally sufficient evidence or in the alternative, a new trial should be granted on mental anguish damages because the award was excessive. In its ninth issue, IP asserts that a new trial is warranted in relation to both Signature and Ogden's claims because the trial court erred in excluding the testimony of IP's key expert. Issues ten and eleven relate to IP's counterclaims and allege that: (10) judgment should be rendered in favor of IP and against Signature for IP's costs incurred defending against Ogden's claims; and (11) Signature should indemnify IP in the event that any portion of the judgment in favor of Ogden, and against IP, survives. We affirm in part and reverse and render in part.

## I.    BACKGROUND[1]

The claims in this dispute involve a contract between Signature and IP to build a slaker for IP's Orange, Texas paper mill in March 2014. IP asked Signature to assemble and install a new slaker, a large vessel that recycles certain chemicals used in the papermaking process, during the annual outage shutdown of the mill. IP initially approached Signature and other companies and asked them to bid on the slaker project;

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

however, Signature was the only company who executed a bid due to the state of IP's bid package. The initial bid package lacked drawings and necessary documents, although seven addendums were later issued by IP. It was debated at trial if the addendums provided enough detail for Signature to make a complete bid. Nonetheless, Signature made a bid in the amount of $775,464.30 for the slaker project. It was also agreed that work that was not contained in the bid package could be paid through field charge orders (FCOs) that were mutually agreed to in writing and approved prior to work commencing.

Signature began work on the slaker project in February 2014 and work was completed around early May 2014. The project was fraught with delays, which Signature attributed to IP. Soon after commencing the project, IP approved and paid FCOs submitted by Signature. During the course of the slaker project, IP representatives told Signature's representatives that instead of submitting each FCO for approval prior to executing the work, verbal approval would be sufficient and Signature could just submit one large FCO upon completion of the project. The modification to the FCO procedure and what was required for payment is the crux of the lawsuit.

Signature submitted multiple FCOs as the project wrapped up, and IP refused to pay the invoices submitted because the amounts far exceeded what IP had expected. IP claimed that Signature's FCOs lacked the appropriate backup documentation needed to justify the amounts invoiced. After the project was completed in May 2014, IP and Signature held two meetings between their representatives to try to resolve the unpaid invoices. Neither meeting was successful and in August 2014, Signature filed this suit alleging fraud, breach of contract, and promissory estoppel. Signature claimed it had

seventeen unpaid invoices that IP refused to pay: ten relating to the slaker contract and seven related to other non-slaker projects.

Ogden, Signature's president, intervened in the lawsuit and alleged personal claims of fraud and breach of contract against IP based on the slaker contract. Ogden alleged he suffered actual damages because Signature was penalized for failing to pay its employees' withheld payroll taxes[2] to the Internal Revenue Service (IRS). According to Ogden, Signature used its employee trust funds to operate its business due to IP's non-payment of invoices. Ogden alleged he became personally liable for those amounts and the IRS penalties on Signature. He also requested damages for mental anguish and damage to his credit reputation.

## A.      Signature's Case-in-Chief

### 1.      Claude Wilhelm

Claude Wilhelm, Signature's senior vice president, was Signature's first witness at trial. Wilhelm testified that he had worked and developed relationships at the Orange mill before IP bought it and that Signature had worked many projects for IP at the mill, both before and during the slaker project. Wilhelm explained that the other partners in Signature wanted to turn down the slaker project initially because the bid documents were "inadequate." He identified the different players involved in the slaker project: Steve Clayton, who was Signature's project manager; Eddie Edwards, IP's project manager; Ray Langley, IP's construction manager; Greg Bennett, IP's subsequent construction

---

[2] Payroll taxes are withholdings from an employee's paycheck that are held in a trust account for the United States government and paid to the IRS. Signature had used its employees' withheld payroll taxes for the business's operating costs and was penalized by the IRS for doing so by the time of trial.

manager; Spencer Shawhan, IP's engineering manager and Edwards's supervisor; and Blake Spurlock, Signature's subsequent project manager.

Wilhelm explained that the bid for $775,464.30 was for the "knowns" on the slaker project and that Edwards had stated that changes required from the bid could be handled with FCOs. Wilhelm stated that the bid did not include piping, another source of contention between the parties. Signature was wary of submitting a bid initially because as Wilhelm said, "everything was off," from labor to material, due to the vagueness of the documents submitted in the bid package. However, IP was on a tight timeline to get the project done during the shutdown and asked Signature to start before the contract was officially signed. There were issues from the outset[3]: the slaker was not clean as promised when Signature arrived and the cleaning caused delays, the drawings had engineering defects that had to be fixed, and a green liquor[4] caustic liquid spill had occurred during the project and needed to be cleaned up before work could continue.

According to Wilhelm, midway through the project, IP told Signature that the FCOs were coming in "too fast," so Signature could just "capture it on a big field change order at the end." Wilhelm stated there were e-mails documenting the change in procedure but Signature did not get the change modified in a contract. Additionally, there were constant changes in personnel. Wilhelm talked about a phone call he received following the green liquor spill stating that Clayton was now not allowed at the plant. When he arrived at the

---

[3] Wilhelm explained that the "knowns" bid included 6,100 man-hours of labor, but it took over 16,000 man-hours to get the slaker project completed due to all the delays and changes that occurred.

[4] Based on a general description at trial, the green liquor is a highly caustic liquid used in the papermaking process that could seriously burn and injure a person if they come into contact with it.

plant to determine what was happening, Signature's documents regarding job details and records were missing from the trailer it had on IP's property. Wilhelm confronted Shawhan and Bennett about the missing files, but neither claimed to know anything about the documents. Wilhelm explained that Signature was forced to recreate the missing documents in order to support the outstanding invoices. Wilhelm tried to explain how Signature developed the invoices and if certain invoices appeared to have labor that was duplicated, it was not billed twice.

Signature's counsel questioned Wilhelm about specific invoices, and he stated that one of the later invoices included a penalty of $350,000, including interest, because there was no cash flow coming into Signature and it had liens and payroll taxes that were becoming delinquent. He stated that the actual labor costs were $783,756, but that did not include other items from the contract such as rental equipment, materials, third-party labor, and company-owned equipment. When everything was included, Wilhelm told the jury that Signature was owed closer to $2.4 million dollars. He stated that Signature continued working because it relied on IP's representation it could submit one final FCO invoice and it would be paid. Wilhelm admitted Signature struggled to recreate the backup documentation because of its missing documents and the fact that IP's gate log system was not accurate.[5] He explained to the jury that some of the invoices grouped types of workers and billed for the group, instead of by each individual worker, and that is why some invoices showed large amounts of hours. However, Wilhelm did agree that, prior to the change in procedure on submission of FCOs, Signature did not have any issues

---

[5] Throughout the trial, IP argued that it used the gate logs to keep track of the workers' time and to verify the invoices.

getting the invoices paid. Wilhelm told the jury that Signature lost work with Valero due to the vendor liens and financial issues that occurred because of the nonpayment on the slaker project. Wilhelm also told the jury about the proposed sale of Signature to Primoris. In May 2014, Primoris made an offer of $42 million to buy Signature. At the end of 2013, however, Signature was "upside down," meaning it was spending more than it was earning. Signature ultimately turned down Primoris's offer.

On Ogden's cross-examination, Wilhelm testified that Ogden is a personal signer and the active individual on the bank agreements Signature had, because he backed everything on a personal level. Wilhelm agreed that the other owners of Signature assigned Ogden their rights to sue for personal damages as it related to this contract with IP. Wilhelm explained that if he received information from IP, he would have told Ogden the same information, including the e-mail chain that acknowledged the changes to the FCO submission procedure.

IP's cross-examination of Wilhelm centered around the disputed invoices. Wilhelm would not agree with IP that the invoices contained errors, even though in his earlier deposition, he admitted the invoices contained different mark-up percentages than were agreed to in the slaker contract. He told IP that he believed the invoices should have been paid in full even if overbilling was included, suggesting that IP could "short pay"[6] what was overbilled. Wilhelm argued that although some of the drawings included piping, Edwards knew Signature's bid would not include piping and accepted that. Wilhelm stated

_____

[6] "Short pay" is a concept the parties described where a company would pay an agreed upon portion of the disputed bill and try to negotiate the remaining amount before paying it.

7

he was asking the jury to award money based off of the field time sheets that documented the daily work, and he believed the unpaid amount owed according to those time sheets was $1.1 million dollars. He explained that, during the meeting in July 2014 between IP and Signature, Shawhan offered to pay around $200,000 to $300,000 of the $1.1 million owed, but Signature refused to accept that amount. Wilhelm admitted that after Signature filed its lawsuit, he went back through and billed for any unbilled time. Although he earlier testified that the disputed invoices reflected $1.1 million in owed funds, after the lawsuit was filed, Wilhelm revised that figure and estimated that Signature was owed $2.4 million.[7] He also said that the tax implications were between $5 million to $6 million and discussed losing the sale of Signature to Primoris for $42 million.

### 2.     Eddie Edwards

Edwards testified that he worked for Ford, Bacon, and Davis (FBD), an engineering firm that has a standing contract with IP in Orange and worked on projects for IP on an "as-needed" basis. Edwards explained that he was considered an IP representative, used IP's e-mail server, and reported directly to Shawhan, and that FBD was the contracting firm.

His position meant he had total responsibility for getting the slaker project prepared and constructed. Edwards stated when he first got involved in the project, there was no engineering package, and only enough information to generate a basic estimate. Towards the end of 2013, as the project manager, he was not getting the engineering drawings and details from FBD that he needed to put the project together. Edwards advised IP that

---

[7] However, during his testimony, Wilhelm stated that Signature was owed $2.1 million, but got paid $1.1 million by IP (two payments of $775,000 and $225,000).

he was unsure if they should do the slaker project during the shutdown because of the lack of documents he wanted, but his expressed sentiment was considered unacceptable by IP, who wanted to continue with the project. IP wanted the slaker replaced because it was ineffective, in poor condition, and hampering production at the mill.

Edwards took the bid package to multiple contractors, but the others could not do the project. He went back to Signature after the others turned the slaker project down and asked if there was any way it could do the project. Edwards agreed that the plans he presented were preliminary and more for "information only" and did not believe that Signature's bid of $775,000 included piping. Signature's bid was for the "knowns" and when drawings changed and were more accurate, then an FCO would be done. Edwards explained that the $775,000 bid was a Time & Materials (T & M) "not to exceed" contract, which meant that the company is paid for the work up to a maximum of $775,000, but any work over the bid amount for "knowns" would not be paid by IP.

Edwards stated he had great faith in Signature as a company, that they did quality work and had excellent craftspeople, and he was satisfied with the work Justin Hall, Signature's construction coordinator, did on the FCOs. When Edwards walked into the Orange mill on the date of the scheduled shutdown, the slaker was still in operation. The slaker was not shut down for another two days, and then Signature needed to clean it in order to begin the project. Edwards agreed that things at the jobsite were chaotic but felt they were under control. He pushed for FBD to provide "better" drawings, helped draw up the FCOs, assisted in getting them approved by IP's managers, but conceded that sometimes he had issues getting the FCOs signed. Edwards testified that the FCOs

9

started "building up" because there were multiple issues that needed to be fixed, until Shawhan finally told him to "just get the work done and we'll worry about it later." Edwards notified the Signature people of the change to the FCO procedure by e-mail.

During the project, Shawhan terminated Langley due to a supposed "safety issue" and assigned Bennett to replace him. Edwards received an e-mail from Bennett saying the FCOs would "go forward on verbal approval," explaining that any procedure change should have gone through him, as he was higher on the "chain of command." When Edwards spoke to Shawhan regarding the change in procedure, Shawhan supported Bennett, and Edwards felt his job authority had been "reduced to zero." Later in the project, Edwards had pre-planned days he had requested off to visit his child, but Shawhan told him that since the project was behind, if he took the days off, he should not return to the mill.

On cross-examination, Edwards thought that based on the bid package, he would have expected $100,000 to $200,000 worth of changes, but it was a particularly challenging project. Edwards explained that he dealt with the first four FCOs and asked Hall for clarification if it was needed. He also said that when Signature was told to hold the FCOs until the end, Edwards never told Signature that they would not need to "prove" their charges with the appropriate backup documentation; he would have expected the same quality of proof he received in the beginning.

### 3. Ray Langley

Langley worked for IP and was asked to come on as a construction manager for the shutdown but was later given the slaker project. He stated that he felt IP's bid package

10

for the slaker project was "middle of the road": enough to determine the basics, but not enough to put finishing touches on the bid or determine the final dollar amount. He agreed that Signature was being asked to bid the "knowns" with a good deal of "unknowns" to come. Langley and Edwards contacted Signature, asking them to bid on the project and "bail them out" because no one else had bid on the project. Langley thought the project was poorly planned, but Troy Waddell, the production manager over the pulp mill area, which includes the slaker, said he would accept nothing less than being finished on schedule.

Langley told the jury that the team on the slaker project was Edwards, Clayton, and himself. He thought highly of Edwards, stating he was one of the best he had worked with. Langley said Clayton was extremely safety-minded, held multiple weekly safety meetings, and was a perfectionist in his bookkeeping and data. Langley did not feel that Shawhan and Bennett were a "part" of the team; instead he felt they were problematic for the project. He explained that e-mails were a big part of the communication method and, although Edwards copied Shawhan on almost every e-mail so that he would know what was going on, Shawhan rarely responded to e-mails and frequently said he did not know information even when he was copied on the e-mails.

Langley testified that he was fired because he supposedly allowed a load to be lifted over some men who were working, which is a safety violation. He stated that the normal procedure was to shut down the area and move people away so that the load could be lifted safely. He also said that, generally, when a dangerous situation occurred, IP would conduct a "safety stand-down," where it held a meeting to explain the problem

and how to prevent the issue from happening, as well as require a report to be filled out, even if the situation was a "near-miss." Langley told the jury that no documents regarding this "safety" violation were found, and he believed the incident was "made up." He stated Shawhan simply told him that "things weren't working out" and let him go. Langley relayed that there were multiple times during the project where Signature would be asked to perform work that was authorized by Edwards and himself, but Shawhan would refuse to approve the FCOs and pay for the work. Langley disagreed with Shawhan because Langley stated that he had asked Signature to perform the work in question. Once Shawhan terminated him, when he returned to collect his belongings in his office, his computer and field journal were gone.

Langley also stated that Bennett had a bad opinion of Signature, stating that they would bid low and then want to do FCOs on everything; Langley disagreed. In his experience, he felt that Signature only requested FCOs on things that "needed to be done." He stated that he never heard anyone else at IP express a bad opinion of Signature.

On cross-examination, Langley agreed that although Shawhan complained about the FCOs and said he would not approve them, he would eventually change his mind and sign his approval on the FCOs. He also stated that Shawhan was a good engineer but not a good "people person." Langley explained that the FCOs that he turned in for payment were properly documented, but he does not know about the FCOs and invoices that were submitted after he was terminated. He testified that he left the project before Edwards and Clayton did.

### 4. Greg Bennett

Bennett testified that Shawhan asked him to come work on the slaker project. When he arrived in the area, he noticed some unsafe work conditions were present. Bennett said he was not present when the green liquor spill occurred but looked into IP's "lockout/tagout" procedures the next day, and he determined that IP's operations had "messed up" the procedure. Bennett agreed that it was IP's operations' responsibility to prevent incidents like the green liquor spill from occurring. He stated that when he came onto the project, he started correcting safety issues, but had never been involved in a slaker installation before. Bennett also said he did not talk to Langley, did not know how far along in the job Signature was, and had just heard the project was over the completion deadline.

Bennett asked Shawhan for assistance in the project, and Shawhan sent four additional men to help him. Bennett conceded that he did not know as much as the men who were actually working on the project. Although he stated there were times he felt that there were "too many" Signature workers on site, he was not aware of anyone being sent home because they were unnecessary. Bennett explained that on T & M not to exceed contracts, it was up to the contractors to manage the manpower and not go over the bid amount.

### 5. Steve Clayton

Clayton testified that he was asked by Signature to go to IP and handle projects at the Orange mill. Clayton stated he was assigned to supervise around thirty projects at IP when he was there. Clayton explained that Edwards, Langley, and himself were a team

and he was involved in the decision to bid for the slaker project. Clayton did have initial reservations about the slaker project, but Edwards assured him everything would be taken care of, and Clayton had no doubt they could get the project completed in the appropriate timeframe. Signature bid the "knowns," but knew there would be costs and changes outside of the initial bid. Clayton said he was getting "big revisions" before the contract was ever signed and he did not have the drawings to fabricate the pipes when the project started.

Clayton arrived to the job on February 21, 2014, to do some work in advance of the shutdown but caught some design defects on the drawings that neither the IP safety people or engineers had noticed. This caused a delay because the drawings had to be redesigned to address the safety issues and IP's approval took "awhile." Clayton stated "everyone knew" there was more to the project than the initial bid. He also explained that, when the project was slated to start, Signature had to spend two days cleaning out the slaker because it was not ready to be replaced.

Clayton continued to describe the delays Signature faced on the project. He stated that not a week went by where Signature was not stopped for "some sort of delay." Clayton and Edwards agreed that a 19% overrun on the bid price was a low number considering all of the issues that occurred. Edwards had told him not to fabricate any pipe until they received isometric drawings from FBD, and having to wait delayed the rest of the project because it delayed the background work. He explained that he had to "rush" work, materials, or equipment, which caused it to be more expensive. He did agree with Bennett that due to the downtime, he sometimes had workers "just standing around," but

14

IP would not allow him to send them home. Clayton explained to the jury that even though an FCO does not affect the T & M contract, he still tried to keep IP happy and manage Signature's money well by asking to send workers home if they were not needed at a particular time.

Clayton testified that when Bennett came on to the project, he changed the protocol and told Signature to not stop and wait for updated drawings and he stated that all the FCOs would be on verbal approval. Clayton disagreed that they should proceed without the drawings and opined the job "went out of control" after Bennett made the changes to the FCO procedure. Clayton also explained that Signature had paperwork of every job they received in the office and kept records of employee clock-ins separately because they did not trust the gate system IP used.

Clayton talked about his experience working with Bennett and said it was "terrible." He had previous safety concerns regarding the green liquor area, had showed Bennett that the lines were not properly locked out, and asked him not to turn them on. Shortly after their conversation, the green liquor line was turned on and almost severely burned Signature workers. Clayton said there was no investigation by IP into how the green liquor spill occurred, but Signature was told to clean up the spill the following day, although they were never given a material data safety sheet which explained how to handle the product. Clayton explained that the green liquor had also ended up in the slaker, so he refused to put his workers back in the slaker, and it caused issues with Bennett and Shawhan. It was later determined that there were seven places on the green liquor line that were not properly locked and tagged; Clayton stated that Bennett did not "have a clue." Shawhan

15

got a variance to work on the slaker again; Clayton was not allowed back on the job site and banned from the mill.

Clayton stated that he received multiple e-mails regarding the quality of the work, how good progress had been on the slaker project, and how well he had handled the project from Edwards. He never believed that Signature would not get paid for its work. Clayton told the jury that he attended the meeting in July with Wilhelm and Ogden. They were asked to bring books so they could go over and close out the bill. He stated the meeting lasted less than an hour, IP never looked at Signature's books, and Shawhan stated he had a number in mind, which was around $200,000. Toni Hanson, IP's senior source buyer, told Signature they would talk through things and get the bills "ironed out," but it never happened. Clayton also filed a lawsuit against IP.

On cross, Clayton said the contract terms were not met on the job because IP directed them to "do things differently." Edwards told him that Signature did not need to provide a detailed description of labor and what had been done in order to get paid. Clayton disagreed with Edwards's previous testimony in which Edwards stated he never told Signature not to provide a detailed description of the labor. Clayton agreed that if the bills and invoices looked incorrect, the parties should sit down and talk about them. He also stated that some of the invoices did not match up, but IP should have called and discussed the mistakes, instead of not saying anything at all. He explained there were multiple billings for piping because the piping kept changing; it was not a double-billing issue but he would have to look at the drawings to understand it.

16

### 6.    Anitra Collins and Roman Gallo

Collins is the mill manager at the Orange mill, and Gallo is her boss. Collins testified that she relied on IP managers at the mill, especially on projects where she does not have direct knowledge and control. She stated that she did not have direct control of the slaker project. Collins explained that the annual outage at the plant is normally for nine days in the spring. The slaker project was considered an "end-of-life" project and the unit needed to be replaced. She said there were two slakers in Orange and if one went down, it limited their production.

Collins talked about the payment process at IP. She stated they generally would issue a purchase order (PO) to a contractor to perform work for a certain amount, which would describe the work they were allowed to perform. If there were any changes, either in scope or amount, IP had to approve in the form of an FCO before the contractor could complete the work. The contractor was required to document and justify the change and have it approved by all the necessary people before any work was started. She said the burden to get change orders approved is on the contractor, and they were trained when they came to IP not to do any additional work until it was approved. Collins explained that even if Shawhan, Bennett, or Edwards told a contractor to do work without a PO or FCO, it was the contractor's responsibility to make sure it had an approved PO to complete the work it was doing. She did state that Edwards could have told a contractor to do additional work without an FCO as long as there were still funds available on the original PO. If a contractor is asked to do work outside of the PO without the appropriate approval, then the contractor is supposed to refuse to complete the work. Collins said there should not

17

have been communication from a project manager that said to "get work done, we'll make it up with an FCO later." She reiterated that it was Signature's responsibility to refuse to do the work without an approved FCO.

Gallo was the vice president responsible for all aspects of the overall operations of the mill. He stated that FBD was in charge of the engineering on the slaker project and that a typical outage takes seven to fourteen days. Gallo did not know why the engineering drawings were not complete and was not aware of any specific issues with the project. He agreed that the green liquor spill was not Signature's fault, that policy and procedure were not followed, and the cleanup was not in the original scope of work. Gallo also said that if a contractor goes onto the premises and does work, they should get paid even if they did not have an FCO approved in advance.

Gallo stated that, based on his understanding of the situation, FCOs were not submitted prior to work being done and the parties were negotiating and working things out, but negotiations had not been completed. He understood there had been a review of the project after it was completed, and it was determined to be over budget and delayed in time. He said the review determined that FBD and the leadership of Signature were inadequate, and it was not a craftsmanship issue. Gallo agreed that if it was IP's leadership that caused additional expenses due to their decisions, then IP is responsible for those expenses; proper documentation should have been put together to show IP was accountable. He said he could understand how Signature might rely upon an e-mail stating it could proceed on verbal approval of the FCOs. Although he agreed that IP's standard practices were not adhered to, Gallo stated that Signature could have refused

18

to do the work outside the scope of the contract. He did also say that in "this specific case, the choices that Signature made at that point in time can be understood."

### 7. Michael Moreno and Chris Wolohan

Moreno and Wolohan testified regarding the attempted sale of Signature to Primoris. Moreno, Signature's corporate representative, stated that Primoris showed interest starting in early 2014. Moreno explained that the original plan with Signature was to try and build up the business and then sell it within three to five years. The sale would have been a cash purchase to acquire the entire enterprise. He stated the sale process begins with him, then gets handed to both parties' operational and technical team, and then to lawyers who would finalize the deal. Moreno said Signature received the first letter of intent from Primoris dated May 19, 2014. However, Moreno stated that Signature's lost income from the contract with IP prevented Primoris from justifying the acquisition to its shareholders and caused it to decline to follow through with the purchase. Moreno told the jury that the loss of $3 million had a domino effect on Signature: it lacked working capital, the loss created tax issues, and other customers became wary about dealing with Signature due to its financial situation and cancelled pre-awarded work they had scheduled. He explained the payroll tax issues "morphed into something greater" as time went on. However, even with the issues, Primoris issued a second letter of intent to Signature on September 2, 2014, as talks had continued through the summer. Moreno stated that Signature turned down the September letter of intent because there was not enough "up-front" money, and it had concerns about the contingent payment portion that

19

would have occurred after closing.[8] Moreno also conceded that Primoris wanted the IRS lien resolved to a "satisfactory level" before closing and that the previous issues had gotten to the point where Primoris would move forward and close.

Wolohan was the head of corporate development for Primoris. He explained to the jury that Primoris is one of the largest construction companies in the country. The first letter of intent Primoris issued on May 19, 2014 proposed an "asset purchase." He stated that the total consideration of the purchase was $42 million, with the initial cash at closing being $32 million plus an additional $10 million in contingency payments spread out through the next few years. Wolohan said there was a second letter of intent issued on May 23, 2014 but sent by e-mail in June 2014. The second letter included the same consideration but changed the net tangible assets at closing from $17.5 million to $15 million. The September letter of intent was still for $42 million total, but at closing, Signature would have received $27 million, and $15 million would be a contingency or added-value consideration to be paid the following April based on various conditions. Signature did not accept any of these offers. Wolohan explained there were additional letters of intent issued in 2016: one for $10.5 million, and a second for $10.45 million.

Wolohan stated that Primoris took its letters of intent seriously, and it set what it felt were "realistic earn-out targets." If Primoris issued a letter of intent, there was an expectation and hope to close the transaction. He explained that when he evaluated Signature, Primoris was impressed with its ability to win work, and that was one of the

---

[8] The May letter of intent had different closing conditions and contingent payment numbers. Moreno described the September letter of intent as having conditions that turned the deal into an "asset purchase with a contingent payment based on future income that the company could generate." If Signature did not meet the required numbers, then Primoris would not pay the additional amounts.

reasons Primoris pursued Signature.

Wolohan testified that the letters of intent were non-binding on both parties. He also agreed with IP that, based on Signature's initial book sheets, Wolohan found it to be a "stressed company" from late 2013 to early 2014, and he had concerns about Signature's financial projections for the future being accurate or attainable. Wolohan agreed that the dispute between Signature and IP was a concern of Primoris's in this deal, but that not remitting payroll taxes to the IRS was also a cause for concern. He stated that Signature's substantial bank debt would need to be paid at closing or require releases before the deal would have been completed. Wolohan also explained that the changed cash closing amount was due to risk allocation with Signature.

### 8. Jeff Ogden

Ogden testified Signature consisted of five owners. He explained that a business like Signature's is relationship-based—the company develops and fosters relationships by doing good work for clients and it relies on word-of-mouth referrals and good experiences. Ogden stated that, in his other business ventures, there were several times they fell behind on payroll taxes because it is sometimes necessary to decide who to pay first: the workers or the IRS. Ogden said he always paid his workers and vendors first. He testified that Signature's 2013 payroll taxes were paid in full by early 2014, before work on the slaker began.

Ogden felt that $775,000 would not have completed the slaker project and even at the outset, there were major modifications that Signature was making. He said Signature completed the first two phases of the project without IP having to hire another contractor

21

but he did not consider the project complete because IP did not allow Signature to hydrotest the slaker—even though it was an industry standard to have the contractor run the test. Ogden estimated that Signature's workers spent 16,300 to 17,000 man-hours on the project. He stated that the personnel changes took a toll on the project: Shawhan took over Edwards's job, Bennett took over for Langley (and IP had to bring in five other people to perform Langley's job), and Clayton was replaced by Signature's employee Blake Spurlock, whom Ogden felt did not have the right type of experience for the project.

Ogden discussed the meetings between Signature and IP. He stated that the questions IP sent to them before the meetings were "ridiculous and impossible to answer." Shawhan went through the disputed invoices during the meeting and said he would not pay for any downtime because they should have managed their workers better. Ogden said Shawhan offered Signature $200,000 to pay the disputed invoices, but Ogden stated that $200,000 would just cover the piping materials they ordered. There was contentious dialogue between Hanson, Clayton, and Wilhelm during the meeting, with the latter two leaving before the conclusion. Ogden told the jury that Hanson said she could not pay him without Shawhan's signature on the forms. Ogden went into the meeting prepared to discuss all the figures and brought who he considered to be the people he needed. Ogden felt that the questions IP posed could have been answered if both sides had been actually willing to sit down and look at the information, but it did not happen.

Ogden also discussed the sale to Primoris. He stated that Signature's financials deteriorated from the upward trajectory it originally had shown when Primoris made its initial $42 million offer. Signature would not have been able to meet the projections

22

because "word" was out that it was having financial issues, and the "targets" Primoris set for Signature to meet were unattainable. Ogden agreed that if he could "go back in time," he would have accepted Primoris's initial offer but he would not have had to consider less beneficial offers had IP paid the invoices.

On cross-examination, Ogden was presented with a 2013 audit showing Signature had current assets of $11,986,151, liabilities of $15,656,725, and $6 million in revolving debt to CommunityBank. Ogden stated "that's how you run a business" when discussing the debt. The 2013 tax liabilities were paid off in January or February 2014, and the late first-quarter payroll taxes were for non-slaker projects that were also being disputed. Besides the tax issues, Signature was affected by a "catastrophic" event that occurred at an Exxon plant, and although Signature was exonerated from fault, there was a period of lost jobs and revenue for Signature following the event.[9] IP also asked Ogden about an incident where Hanson asked Signature not to invoice the FCOs until they were able to resolve the issues, but Wilhelm submitted the invoices anyway because it showed as revenue and could be used to borrow money from the bank.

Ogden also clarified that the audit showed the wrong information. He stated that Signature's total assets were $23,584,869, its total liabilities were $20,262,427, and its members' capital was $3,322,442, which left them with $3.2 million on the "right" side.

### 9. Spencer Shawhan

Shawhan testified that he was the project engineer as well as the acting

_____

[9] Although Ogden testified that he did not believe the event at Exxon "caused problems" with Signature's financials, he did state that it lost "five months" of jobs and revenue until Signature was exonerated by Exxon's investigation as to liability for the accident.

engineering manager at the Orange plant. Edwards was his project manager on the slaker project and put together the team to develop the project. Shawhan explained that there are three types of drawings used in the bid process: preliminary, bid, and construction. He recalled that the engineering drawings were not ready when Edwards wanted to solicit bids, but he does not recall Edwards telling him they should wait on the slaker. IP's total budget for the slaker was $3.4 million, but he does not consider the project finished because he cannot figure out what IP owes Signature to this date. Shawhan felt they could build the slaker for $775,000 and that there were enough details in the bid and addendums to put together an appropriate estimate. He did not think more detailed drawings were required and was unaware that Edwards had requested them.

Shawhan stated that he normally does not see the invoices or backup documentation but has in this case due to the litigation. Normally, the documents go to an auditing group that reviews them and will directly contact the vendor if there is an issue. It is the auditing group who decides who gets paid, not him. He said he did see the FCOs and backups Signature submitted, and he and Hanson tried to question several things but "never had an opportunity to."

Shawhan explained that the Signature contract allowed for extra work to be done on a T & M basis and that standard procedure required extra work to be approved in advance. The first FCOs that Signature submitted were approved, contained the proper documents, and Signature was paid. Shawhan agreed Bennett gave the instruction to move forward absent drawings and to continue the project on verbal approval only. Shawhan stated that neither he nor Bennett has the authority to give that order or make

24

changes to the contract, but he did not do anything to correct the order even though it was a violation of IP's policy. He also agreed that there were issues with the project that Signature was not responsible for, such as the green liquor spill, and he recommended paying the entire invoice involved. Shawhan testified that he intended to pay Signature for the work it performed and thinks it should be paid for that work. However, he also testified that Signature could not be paid because negotiations ended, and the lawsuit was filed.

Shawhan explained that Langley was fired because he allowed a safety violation to occur. But Shawhan acknowledged that he did not do anything to stop the safety violation, even though he saw it, and he did not know if there was a safety stand-down meeting regarding the incident. He also conceded that Langley was the only person running the slaker project, but when Bennett replaced him, they had to bring in more people to help on the project.

Regarding the hydrotest, Shawhan said the slaker was tested the first time it was filled up with green liquor and did not leak; although the industry standard is to test it with water first. He also wrote a memo to Collins regarding the project, but he did not tell her that he approved the FCOs verbally, that he had witnessed safety violations, or that Bennett violated company policy by authorizing a final, large FCO. He blamed everyone but Bennett and himself. Shawhan tried to create his own Powerpoint presentation to understand Signature's invoices but said it was "difficult" to do "without having the benefit of getting to talk to them." He also told the jury that he and Hanson did not realize the piping was not in the original bid request and nothing in the proposal indicated it was not

25

part of the amount.

On cross-examination, Shawhan agreed that Signature did good work on the slaker. He felt IP prepared a "good bid package" that was sufficient to put together a good estimate. Shawhan stated that, even though Signature was told it could proceed with verbal authorization, everything still needed proper backup documentation, and the auditing department determines if an FCO is paid or not. He explained he preferred the prior approval of FCOs to avoid the situation they were in currently. He said there was never a plan or scheme with Edwards to not pay Signature. Shawhan was surprised by some of the disputed invoices items, such as piping, that had been included on previous paid invoices, but was also showing up in some of the later disputed invoices.

He said in April 2014, when Signature requested $2.1 million but offered to settle for $1.7 million, the disputed invoices had not even been submitted to IP. While he agrees that Signature is owed more than what was in the original bid, he disputes the amount Signature demands. He could not recall Ogden telling him anything about "killing" the sale of Signature during the July meeting.

**10.    Don Coker**

Coker was Signature's expert on company valuation. Coker said there are certain categories that you can add up to determine the number for damages. He used the following: the Primoris letter of intent, owner equity and assets, and IRS penalties and liabilities.[10] He explained that he used the amount Primoris offered Signature because he considered it a bona fide offer. Coker stated that a bona fide offer from a knowledgeable

---

[10] Coker explained that the IRS liabilities comprised penalties only and did not include any actual tax because that would have been owed regardless of IP's actions.

buyer is what to consider in determining the value of a company and therefore, this was his estimate of what Signature was worth as a company. He also believed the unpaid bill to Signature was very critical because it could not pay its expenses, so that is how it ended up with a negative net worth. He explained the following regarding owner equity and assets:

- previous to 2016:

  | | |
  |---|---|
  | total assets: | $23,584,869 |
  | total liabilities: | $20,262,427 |
  | owners' equity: | $3,322,442 |

- March 2016:

  | | |
  |---|---|
  | total assets: | $15,684,844 |
  | total liabilities: | $24,793,903 |
  | owners' equity: | $-9,109,059 |

He said that when a customer or lender perceives a company to be in financial distress, it can lead to the loss of business, which can make the situation worse. He felt the damage to Signature was traceable to IP's action and lack of payment. He agreed with Ogden that some of a business's catastrophic events can trickle down to the owners of a company.

In order to determine Signature's damages, Coker took the following figures:

| | |
|---|---|
| - Primoris offer: | $42,000,000 |
| - Owners' equity loss: | $12,431,501 |
| - IRS penalties: | $1,853,132 |
| - Total sum: | $56,284,633 |

On cross-examination, Coker admitted he had taken a one-week business course from Harvard University on valuation, but his degree was in political science. He agreed there were multiple $42 million offers from Primoris to Signature with different conditions

attached. He also said that Signature would have made around $11.1 million from the sale with all the debt gone and assets transferred to Primoris. However, the June letter of intent based a substantial amount of the $32 million in cash on earnout, which is based on future expected value and business that Signature would get from its customers. He explained he determined Signature's pro forma revenue (i.e., his estimate of what Signature would be worth at that time) by comparing its March 2016 balance sheet to a December 2013 balance sheet, but he did not analyze any of the invoices to determine if Signature was owed $2.4 million by IP in 2014. IP argued the disputed invoices amounted to $1,000,085, while Coker said the $2.4 million amount considered the slaker and "other jobs." He believed Signature was considered a "stressed company" in late 2013, because it had not been paid for another IP project called the "bale conveyer" project.[11] Coker did not think the Exxon event in 2013 was a "significant factor" in Signature's financial situation.

Coker repeatedly referenced other projects between Signature and IP, but not the slaker project. When questioned about the taxes, IP showed through documentation that Signature was behind $2.168 million at the end of 2013, and was also behind during the first quarter of 2014, prior to the slaker project being completed. Coker stated that the Primoris offer would be the "minimal value for the company." He testified that he did not do a market value analysis of Signature, but just looked at existing financial statements.

---

[11] Coker disagreed that the bale conveyer project also happened in 2014. He stated that IP "slow-paid" Signature for the project.

**B.** **Ogden's Case-in-Chief**

**1.** **John Ulzheimer**

Ulzheimer was an expert witness hired to do an impact analysis on what kind of damages Ogden suffered and the impact on his credit reputation. He explained his assignment was to provide an inventory of the severely derogatory information on Ogden's credit reports due to the failed business relationship. He presumed the information was present because of the actions of IP, and he was asked to determine what his credit score would have been without these derogatory marks. He told the jury he decided to do an impact analysis due to the lack of any other major derogatory entries to the credit report.

Ulzheimer stated that Ogden had $9,000 of credit card debt on a defaulted American Express credit card, a tax lien, and a hard inquiry into his credit in January 2017, which would have affected his credit score. The tax lien is the IRS tax lien Ogden acquired from Signature. He believed that getting rid of the tax lien and American Express card settlement would boost Ogden's credit score close to seventy points. However, the lien payments were also coming from Signature, not Ogden personally.

**2.** **Jeff Ogden**

Ogden testified again, this time relating to his personal cause of action against IP. He said he personally guaranteed all of Signature's liabilities and that everything he owns is collateralized in Signature. He told the jury that he is signed on as the managing member and president of Signature, the grantor on the business, and as an individual at the bank.

Ogden stated that he is not delinquent on his personal taxes, but due to him being the trustee and managing member of Signature, the IRS penalized him for Signature's delinquencies on payroll taxes. The 2014 payroll taxes Signature owed were:

| | |
|---|---|
| 1st Quarter: | $127,553,39 |
| 2nd Quarter: | $1,000,888.26 |
| 3rd Quarter: | $754,253.21 |
| 4th Quarter: | $912,279.64 |
| Total: | $2,803,974.50 |

He stated that once the workers were paid, he begged IP to pay him. At the July meeting, Ogden told IP they were ruining Signature by not paying and he was losing the sale to Primoris, but Shawhan still did not want to pay him. Due to lack of payment, Signature now pays the IRS $7,000 a month to cover the tax lien. Ogden explained that he took a "massive" paycut and cut expenses in order to make it work. He also told the jury that he defaulted on Signature's bank debt and if the payments are not made on that, the bank and IRS can come after his personal items.

Ogden testified that, even though he would have received a tax refund as an owner of Signature in 2014, because they were operating at a loss, the IRS took his overpayment and applied it to the lien amount and would continue to do so until the lien was paid in full. He said due to the situation, he has had additional lawsuits filed against both Signature and him personally, it had destroyed friendships and relationships, and he was "barely" keeping Signature's doors open. Ogden explained that he relied on IP to pay Signature, and that was why he put his name "on the line" with the IRS.

Ogden told the jury that when Signature first started, it used his personal American Express card for business expenses because there was a larger line of credit available.

30

But when financial issues started and it became delinquent, American Express wrote off $111,483 in debt and closed the account.

Ogden also explained the assignment from Signature. He stated that all the other partners in Signature assigned him the right to sue for personal damages under the IP contract. The other owners in Signature could file bankruptcy and walk away from the company, but Ogden said he could not because he was personally liable for Signature's debts. Ogden also was not aware of anything in the corporate documents that said the other owners in Signature could not assign their rights to him to sue.

Ogden testified that he felt that Shawhan was not truthful with Signature and if Ogden had known that submitting one big final FCO was a violation of IP's policy, then he would have "done things differently" and not put his company "at stake." He explained that he personally relied on the information relayed to him and contained in the e-mails.

The credit reputation damage he suffered was due to the tax lien and American Express debt. Ogden had his credit checked in January 2017 in an attempt to purchase a truck. However, he said that once the credit was checked, the interest rate would have been higher than the principal, so he did not end up purchasing the vehicle. Ogden stated that there is no doubt in his mind that the damage to his credit reputation is a result of IP not paying Signature.

Ogden also explained his mental and emotional stress. He said he does not sleep much, his phone rings constantly, and he is overwhelmed. He stated his family relationship has suffered, and he is like a "zombie." He suffered from embarrassment and does not leave his house much. His family attempted to help by getting him an emotional

support dog. He felt that IP should be "ashamed of themselves," that his business was "gone," his name is "gone in the industry," and he has nothing to "fall back on." Ogden cannot contribute any other cause to Signature failing other than IP not paying the invoices.

## C. IP's Case-in-Chief

### 1. Toni Hanson

As the senior sourcing buyer for IP, Hanson was involved in the commercial and contract side of the slaker project. Edwards got her involved in the project in June 2013 and she focused on purchasing the equipment needed. Hanson said that $3.4 million was the total appropriation for the project, which would cover engineering costs, Edwards's salary, other contract employees they needed to hire (not including Signature), installation, equipment, and a contingency fund for unexpected costs.

In January 2014, Edwards was concerned with the bid package because the scope of work had not been completed and it needed another revision, but the necessary drawings were not available. Hanson explained that IP does not normally send out bid packages that are incomplete; occasionally it happens, but drawings have to be complete and sent to the bidder before the final bid comes in. Edwards assured her that would happen in this situation and sent the bid package to five bidders. He sent out addendums to the original bid package afterwards that included drawings and "other documents." Hanson stated that only Signature submitted a bid and there was substantial work going on with other companies in the area at the same time, as well as demands from the oil field.

Hanson stated that Signature never told IP that it was having financial difficulties; otherwise, IP's finance department would have looked into Signature closely. Hanson also testified that Signature did not tell IP it was attempting to sell the company during that time frame, which would have been a "huge red flag for awarding business." Hanson said that she included a sample contract in the bid package so Signature could see the terms they would be agreeing to in the contract. Signature made a few changes to the terms of the bid contract and was awarded the work on February 21, 2014, when she sent it a draft contract. Hanson explained that she has the authority to award work without an issued PO as a purchasing agent, but not everyone has the authority to do so.

Article ten of the contract refers to lien releases which Signature was required to execute before receiving final payment. She asked Wilhelm for the releases twice via e-mail. Hanson also explained that the contract contained an indemnity clause that required Signature to comply with federal law relating to its employees' taxes. Hanson did not believe that Signature agreed to indemnify IP for liability from Ogden's lawsuit.

At the April 2014 meeting, IP gave Shawhan six additional FCOs. Hanson said that if FCOs come in after work is completed, then IP requires the vendor to provide complete documentation. That is considered an industry standard, not just something unique to IP. However, even without the formal FCO process, the contractor should have let the project manager know the costs. The project manager is required to have "intimate knowledge" of how the work is progressing, what work still remained, and how much cost should remain. Hanson stated that Edwards had already authorized an additional $275,000 and IP thought the April meeting would involve another $300,000 to "wrap" up the remainder

of the outstanding costs. Signature's invoices asked for over $1 million in addition to previously approved amounts. Hanson said there was no "scheme" involved to "string" Signature along and not pay them. Hanson requested backup documentation to support the FCOs presented because Signature had just presented a one-page document on their letterhead with a brief description and no backup documentation. It was Hanson's job to investigate the charges and verify they were accurate. She agreed that Signature did send her documents, but she said it did not identify which documents went with each FCO and IP could not "make heads or tails out of it." Hanson stated that IP had never had a vendor who was not able to prove up their charges properly.

She was willing to pay Signature if they could prove up the charges, so Hanson wrote out questions for Signature to direct them to the information required for each FCO; she also wanted to verify it was not the same amounts IP had already paid for. However, Hanson said she did not get answers to most of her questions. As an example, Hanson explained that half of the labor cost in the original $775,000 bid was for pipe fitters and the original bid had $60,000 of pipe included. However, one of the FCOs requested $529,000 and stated it was for "all piping fabrication and steel installation not included in the original bid," so she wanted clarification on the difference. Hanson agreed that Signature sent her more concise information, but Signature never told her they could not provide certain backup because its documents were stolen. She also stated that some of the backup Signature did provide raised concerns about the way it was billing IP—for example, trucks being billed hourly instead of daily or within the original scope of work, and one person billed forty hours in one day.

Hanson testified that at the July meeting, both sides tried to sit down and understand the charges, but Signature could not explain "why documents were where they were." She agreed that Shawhan said IP could justify $200,000 to $300,000 but would need help to justify the rest. Wilhelm responded by saying that he wanted "one hundred percent or nothing" or he would sue. Hanson did not remember any of the Signature representatives stating that IP was "destroying their business" or "harming a sale." She disagreed that she told Signature that she would pay them, but Shawhan "wouldn't let" her. Hanson stated she was not convinced all the charges Signature claimed were valid.

Hanson also talked about the bid process. She stated that the approval of the FCOs was necessary so IP could keep track of what is going on with a project, but also so it can plan the budget and make sure there is sufficient money to pay the FCOs. Hanson said it is the vendor's job to present the documentation in a concise way in order for IP to understand. She contacted Shawhan regarding questions she had on the project and expected him to know what went on. She also stated that she did not contact Edwards because he was no longer employed by IP. Hanson agreed that she finally got more detailed documentation, but the work was not paid because by then, Signature had filed its lawsuit. Hanson disclosed that IP made a payment of $550,021 into the registry of the court prior to trial.

On July 22, 2014, Hanson sent an e-mail to Ogden in which she attached the payment history for outstanding POs on the slaker project, a list of outstanding invoices, and several notices of liens and lawsuits that had been filed. She wanted to understand

why Signature claimed the invoices had not been paid, when IP had paid Signature $1,018,487.63, and she needed to have all outstanding invoices paid and lien waivers from each of the vendors. Hanson stated that she never refused to pay Signature if it provided the appropriate backup, and she had expected Signature to walk her through the explanations of the FCOs at the meeting but it never happened.

### 2. Justin Hall

Hall was the construction coordinator for Signature at the Orange mill. He was involved in the scheduling, planning, and estimating for projects, and in having the time sheets signed by the clients. Hall stated he was involved in estimating the slaker job and could only "bid the knowns." He was in charge of the time sheets (containing labor hours and costs) IP would sign, as well as change orders and any turnover packages that came out of the project. Hall also acted as the "go-between" for Hanson and Signature.

Hall explained that there were two other employees that had a similar job and the three of them handled the forty-four projects Signature was working on at the mill. He stated that they used a trailer that IP had given them as their office, and Clayton's office was located in the same trailer. He believed that Blake Riley, with Signature, was the main person tracking the slaker project. According to Hall, a Signature foreman would keep track of the men and their hours worked while in the field and then he would turn that sheet into a timekeeper after every shift. The timekeeper would input the sheet into payroll, compare it against the gate log, and prepare the timesheet. Clayton would approve the timesheet and it would then be taken to the project manager for approval. Hall stated that a timesheet is different from a payroll sheet, and the payroll sheet would

be attached to the invoice submitted to IP as backup. Signature also used the payroll sheet to determine the workers' pay.

Hall testified that Edwards wanted Signature to "hold all change orders until the end of the project and submit them at the end of the project" to reduce the amount of change orders he received daily. Hall was not aware that multiple change orders were submitted after the project ended. He was later tasked with reconstructing the backup documents for the disputed invoices.

On cross-examination, Hall stated that the backup documentation was kept in a file cabinet or bookshelf in the trailer. He said that, when he and his colleagues came in one morning, all the documentation had been taken and someone had reported seeing a person from IP in the trailer area. Signature ended up without several binders of information which contained information from all forty-four jobs at the Orange mill. Hall explained that they had no backup data for any of the jobs, so they had to reconstruct everything.

### 3. Ron Michalk

Michalk was Signature's controller and chief financial officer during the Primoris sale negotiations. His job was to provide the information that Primoris requested of Signature. He explained that negotiations were confidential in 2014.

Michalk talked about how Signature was supposed to make weekly deposits for its payroll taxes. However, as the financial situation deteriorated, Signature began using the money to pay vendors and finance the company, just "try[ing] to stay alive." Michalk agreed that in December 2013, Signature was "cash-strapped" and struggling to meet its

financial obligations. He said that in 2014, Signature lost $6.8 million, used its payroll money for operations, and the owners ran personal expenses through the company, with Ogden and Wilhelm doing so the most.

Michalk stated that Signature's financial situation improved in 2015 because it completed some good turnaround projects.

### 4. Barry Loder

Loder worked as a consultant for Signature, to help with strategic consulting and teaching Signature how to build and grow the business. He created a Powerpoint presentation for discussions with Primoris. He felt that three things impeded Signature's ability to prosper: insufficient working capital, slow-pay accounts receivable, and inadequate financing. Primoris could have come in and provided the working capital to grow the business and achieve the projections he had helped develop with the management. He felt Primoris's first offer was good and he personally would have advised Signature to take it. Loder also thought the September 2014 offer from Primoris was "still a relatively good offer."

### 5. Richard Domercq

Domercq was the valuation consultant hired by IP to evaluate Coker's report, Signature's financial status, and compare the invoices. He found there were seven "disputed" invoices that totaled $1,085,000. Domercq felt that $535,000 was overbilled and the maximum valid charges contained in the invoices totaled $550,000. He came to that determination by looking for duplicate billing or expenditures that were not within the scope of the contract.

Domercq stated that Signature provided IP with a weekly labor and cost approval form of its own making that was sorted by "craft" or type of work, instead of by individual employee. The form grouped a "bunch of people" together and billed them as a group, instead of showing a daily detail for each individual worker. Domercq and his team created a spreadsheet listing every employee, taking information from the hours tracking form. He found that Signature had billed 23,000 hours for the slaker project, of which 13,506 were disputed. The cost report from Signature showed 15,783 hours, Domercq's analysis showed 16,244 hours, and Signature billed almost 23,000. He attributed the differences to overbilling. He felt that Signature had overbilled $635,000, but he admitted there was some labor that was not billed so he gave Signature a credit for that in the amount of $141,000. Domercq stated that he relied on the master payroll in developing his analysis and found that the $550,000 was supported by Signature's backup. He also said that IP paid liens that totaled $95,840, so if the jury considered that as an offset, Signature was still owed $454,000.

Domercq also reviewed Coker's report. He stated that Coker did not do an independent verification of the information Signature gave him, but instead made assumptions contrary to the facts. Domercq testified that the biggest assumption Coker made was that, when the slaker project was completed, IP owed Signature $2.4 million and refused to pay. He said Coker also assumed one could measure the value of the company by stockholders' equity and did not look at the other factors that could have affected the financial condition. In his professional opinion, Domercq did not feel it was reasonable to conclude that a $500,000 to $1 million invoice dispute would be a

39

substantial factor in bringing about the decline of the stockholders' equity.

### 6. Bryan Byrd (Bill of Exception)

Byrd's testimony was excluded by the trial court, who found it to be cumulative to other witnesses. Byrd explained his experience was in T & M contracts and backup documentation. He said there was enough detail found in the bid package and seven addendums to construct a detailed bid on piping for the project. He also felt one needed training in construction to be able to interpret the drawings and understand Signature's bid. He stated that based on the cost for labor in the bid, piping would have been included in those numbers.

In speaking about specific disputed FCOs, Byrd found the backup to not have enough detail or description to support them. He felt the information was not adequately detailed, there were too many questions regarding the scope of work changes that were asserted, and there were too many documents that showed that Signature was responsible for the extra work to support the scope of the FCOs.

### D. Verdict

The jury found for Signature and Ogden on all the questions submitted to it. For breach of contract, promissory estoppel, and fraud, the jury awarded $2,442,515.28 in actual damages and $56,284,633 in consequential damages. Regarding Ogden, on breach of contract, the jury awarded $2.8 million in actual damages, $111,000 for past credit reputation damage, and $1.3 million for future credit reputation damage. On his fraud claim, the jury awarded Ogden $13 million for past mental anguish damages and $50 million for future mental anguish damages.

**E.     Indemnity Claims, Post-Trial Motions, and Judgment**

Following the trial, the parties agreed to have IP's indemnity claims heard by the trial court. IP had filed a motion to enforce the indemnity provision in Article 8.6 of the slaker contract,[12] claiming that Signature should indemnify it for its attorney's fees, costs, and expert fees used to defend against Ogden's claims. At a hearing held on July 24, 2017, IP stated Signature's duty to indemnify was based on the slaker contract and Signature's failure to pay the payroll taxes to the IRS opened IP up to liability. IP also argued Signature had not filed an answer to its counterclaim for indemnity and had thus waived any affirmative defenses. The trial court granted Signature leave to file an answer on the same day as the hearing. Later, the trial court denied IP's motion to enforce

---

[12] Article 8.6 of the slaker contract stated:

6. Indemnity. The CONTRACTOR [Signature] assumes the defense and the entire responsibility and liability for any and all damage or injury of any kind or nature whatsoever (including resulting death) to all persons, whether employed by the CONTRACTOR or otherwise, including but not limited to (a) employees and agents of subcontractors of CONTRACTOR or COMPANY [IP], or (b) any other third party, and to all property (other than the work itself as set out in paragraph 7 below) caused by, resulting from, arising out of, or occurring in connection with the performance by CONTRACTOR, or any subcontractor or agent of CONTRACTOR, of this AGREEMENT. In the event the liability of the CONTRACTOR shall arise by reason of the sole negligence of COMPANY, then and only then, the CONTRACTOR shall not be liable under the provisions of this paragraph. If any person makes a claim for any such damage or injury (including death resulting therefrom) as hereinabove described, the CONTRACTOR agrees to indemnify and save harmless the COMPANY, its agents, servants and employees from and against any and all loss, damage, injury or expense including reasonable attorney's fees that the COMPANY may sustain as a result of any such claims, and the CONTRACTOR agrees to assume, on behalf of the COMPANY, the defense of any action at law or in equity, which may be brought against the COMPANY upon such claim and to pay on behalf of the COMPANY upon its demand, the amount of any judgment that may be entered against the COMPANY in any such action. In any suit or claim by COMPANY, CONTRACTOR hereby expressly waives any immunity from suit which might otherwise be conferred by the Workers' Compensation laws of any jurisdiction and which would preclude enforcement of the indemnification clause of the AGREEMENT by COMPANY, and CONTRACTOR further agrees to pay any reasonable attorney's fees as are incurred by the COMPANY in securing compliance with the provisions of this indemnification.

indemnity.

The trial court entered its judgment on December 14, 2017, awarding Signature $58,174,672 in actual and consequential damages minus offset amounts,[13] as well as prejudgment and additional interest. Ogden was awarded $67,211,000 in actual and consequential damages, as well as prejudgment and additional interest. Both parties were awarded attorney's fees in varying amounts.

On January 12, 2018, IP filed a motion for judgment notwithstanding the verdict and a motion for new trial, which were overruled by operation of law. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE RELATED TO SIGNATURE'S CLAIMS

By its first three issues, IP alleges that Signature failed to present legally sufficient evidence for (1) its breach of contract, (2) fraud, and (3) promissory estoppel claims.

### A. Standard of Review

A legal sufficiency challenge will be sustained when the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. We review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable

---

[13] The trial court reduced the jury's verdict by $550,021 representing the amount IP had deposited into the registry of the court before trial, and an additional settlement of $2,500 representing an earlier settlement with another early party to this case.

42

fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id.* at 821–22, 827. In our review, we are mindful that the jury remains the sole judge of witnesses' credibility and the weight to be given to their testimony. *Id.* at 819–20. Moreover, in our legal sufficiency review, we must show deference to the jury's resolution of conflicts in the evidence, and we must presume that the jury resolved all conflicts in favor of the verdict. *Id.* at 820–21.

A party who challenges the legal sufficiency of the evidence to support an issue upon which he did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *State Office of Risk Mgmt. v. Pena*, 548 S.W.3d 84, 90 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.); *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas 2000, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)).

When a party attacks the legal sufficiency of an adverse finding on an issue on which that party has the burden of proof at trial, the complaining party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). We review a matter of law challenge by first examining the record for evidence that supports the adverse finding, while ignoring all evidence to the contrary. *Id.* If we do not find evidence to support the finding, we will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* "The point of error should be sustained only if the contrary proposition is conclusively established." *Id.*

The fact finder is the sole judge of the witnesses' credibility and may choose to

believe one witness over another. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We may not substitute our own judgment for that of the jury, even if we would reach a different answer based on the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998)).

## B. Breach of Contract

By its first issue, IP argues that the evidence is legally insufficient to support the jury's verdict as to breach of contract. To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *First Nat'l Bank of Edinburg v. Cameron County*, 159 S.W.3d 109, 112 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied).

### 1. Jury Questions

The jury was asked to consider the following questions related to breach of contract:

**Question No. 1(a)**

Did Signature and IP agree that Signature would provide labor, material, and services in exchange for payment from IP?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer "Yes" or "No" with respect to each of the following:

(1)     Slaker Project

44

Answer:        Yes

(2)     Non-Slaker Project

Answer:        Yes

**Question No. 1(b)**

Did IP fail to comply with such agreements?

Answer "Yes" or "No" with respect to each of the following:

(1)     Slaker Project

Answer:        Yes

(2)     Non-Slaker Project

Answer:        Yes

**2.     Condition Precedent or Covenant**

IP argues that it was not required to pay the disputed invoices because Signature provided insufficient backup documentation to support the invoices. IP states that the backup documentation was a condition precedent to its requirement to pay, and because that condition was not met by Signature, IP was not obligated to pay.

A "condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Application Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (quoting *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."). A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way. *Solar*

45

*Application Eng'g, Inc.*, 327 S.W.3d at 108. Breach of a covenant may give rise to a cause of action for damages but it does not affect the enforceability of the remaining provisions of the contract unless the breach is material or is a total breach. *Id.*

In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) (op. on reh'g). "In order to make performance specifically conditional, a term such as 'if,' 'provided that,' 'on the condition that,' or some similar phase of conditional language must normally be included." *Id.* at 948. When "no conditional language is used and another reasonable interpretation of the contract is possible, 'the terms will be construed as a covenant in order to prevent a forfeiture.'" *Id.*

Here, Article 4 of the contract stated:

CONTRACTOR [Signature] shall send to COMPANY [IP] on the 15 and 30 day of each month a detailed statement of all reimbursable costs incurred and actually paid by CONTRACTOR during the preceding period, together with original payrolls for labor, checked and approved by persons satisfactory to COMPANY, and all receipted bills, paid original invoices or other documents requested by COMPANY. Within thirty (30) days from the receipt of the statement, COMPANY agrees to pay CONTRACTOR the amount of the statement.

Prior to final acceptance of the Project, CONTRACTOR shall deliver to COMPANY a statement, together with satisfactory evidence, that all payrolls, material bills[,] and other indebtedness incurred by CONTRACTOR and all subcontractors in the performance of this AGREEMENT have been paid[,] and CONTRACTOR agrees to hold COMPANY harmless on account thereof. COMPANY may at any time withhold payment of all or any part of the Contract Price to such extent as may be necessary to protect itself from loss on account of:

(a)     defective work not remedied;

46

> (b)     claims filed by third parties or reasonable evidence indicating the probable filing of such claims;
>
> (c)     failure of CONTRACTOR to make payments due to subcontractors or suppliers of material or labor;
>
> (d)     a reasonable doubt that the Project can be completed for the balance then unpaid under this AGREEMENT;
>
> (e)     an existing breach of the AGREEMENT by CONTRACTOR; or
>
> (f)     damage to another person, firm or entity caused by acts or omissions of CONTRACTOR.
>
> When the ground or grounds for withholding payment are removed to the satisfaction of the COMPANY, CONTRACTOR'S right to payments [sic] as herein provided shall thereupon be reinstated.

Signature argues in its brief that none of the requisite terms are contained in the IP slaker contract to change this requirement into a condition precedent. We agree.

The slaker contract required documentation to be approved by "persons satisfactory" to IP and once the statement was received, it would be paid within thirty days. There is no specific language that says IP was only required to pay when it agreed the documentation was complete or anything to that effect. The jury rejected IP's contention that it did not have to pay the invoices because there was not sufficient documentation presented. Since there was no conditional language found within the contract and there were multiple interpretations of how the contract could be read, we construe the language as a covenant. *See id.* Because we agree that the documentation requirement was not a condition precedent to IP's requirement to pay, we move to the breach of contract argument.

47

### 3. Breach

Under the elements required for a breach of contract, the evidence showed there was a valid contract between IP and Signature, that Signature performed the job requested under the contract, and Signature was damaged due to the non-payment that resulted. *See First Nat'l Bank of Edinburg*, 159 S.W.3d at 112. IP admitted during trial that Signature was owed money for the slaker project; however, the amount owed was in contention.

IP is required to show that there was no evidence to support the adverse finding it is challenging. *See Pena*, 548 S.W.3d at 90. However, the evidence presented showed that Signature performed its principal obligation: to construct and install a new slaker. The parties agreed that the initial FCOs were submitted with approved documentation and were paid by IP with little issue. It was after IP's representatives made changes to how the invoices were to be submitted that issues arose. The jury heard testimony from multiple witnesses stating that FCOs were approved verbally, submitted with documentation, and then never paid.

The jury was entitled to disbelieve IP's witnesses who claimed the documentation was insufficient and therefore, it was not required to pay the disputed invoices. *See Golden Eagle*, 116 S.W.3d at 761. In any event, the jury was also presented with thousands of pages of evidence showing the invoices and documentation Signature submitted to IP, and it could have reasonably found the documentation was sufficient to justify payment. *See Pascouet*, 61 S.W.3d at 616. The evidence at trial was sufficient to

"enable reasonable and fair-minded people to reach the verdict under review." *See City of Keller*, 168 S.W.3d at 827; *see Pena*, 548 S.W.3d at 90.

IP raises multiple additional sub-issues regarding the breach of contract claim—for example, it argues Signature failed to prove the disputed amounts of the invoices, the invoices were not accurate, and the invoices were in excess of what IP's expert, Domercq, testified was owed—but those points were all fact issues that were within the domain of the jury to consider. The jury determined which facts and witnesses to believe or disbelieve, and we defer to its findings. *See City of Keller*, 168 S.W.3d at 820–21; *Golden Eagle*, 116 S.W.3d at 761; *Pascouet*, 61 S.W.3d at 616. IP additionally complains that the jury was not given instructions on waiver, frustration, impracticability, or other doctrines that would have allowed it to consider Signature's inability to provide detailed invoices in determining whether a breach occurred. However, IP does not raise an issue on appeal related to the jury charge, so we will not consider jury charge issues. *See* TEX. R. APP. P. 38.1.

There was more than a "scintilla of evidence" presented at trial to support the jury's findings, in response to questions 1(a) and 1(b) of the jury charge, that IP breached the slaker contract. *See City of Keller*, 168 S.W.3d at 810. We overrule IP's first issue.

## C.    Fraud

By its second issue, IP alleges the evidence is legally insufficient to support the jury's verdict for fraud. The jury charge contained the following question and instructions regarding fraud:

Did IP commit fraud against Signature?

49

Fraud occurs when:

(1)     A party makes a material misrepresentation, and

(2)     The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

(3)     The misrepresentation is made with the intention that it should be acted on by the other party, and

(4)     The other party justifiably relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

To hold [IP] liable for fraud, you must find that a single employee of [IP] committed all elements of fraud while acting within the scope of his employment.

A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (op. on reh'g). The mere failure to perform a contract is not evidence of fraud. *Id.* At trial, Signature had to present evidence that IP made representations with the intent to deceive and with no intention of performing as represented. *See id.* Additionally, the evidence presented must be relevant to IP's intent at the time the representation was made. *See id.* As noted supra, the jury agreed with Signature and found IP committed fraud.

In our review of this finding, "all of the record evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Id.* Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.*

50

Signature alleged that IP changed the procedure for the submissions of the FCOs in order to induce Signature to continue the work to meet the timetable IP wanted. Although there was evidence to support some of the required elements of fraud, Signature did not prove all the elements needed. *See First Nat'l Bank of Edinburg*, 159 S.W.3d at 112. There was no evidence presented that, when IP informed Signature that it had changed the procedures used to submit the FCOs, it also had no intention of performing. Prior to Signature being told to alter the procedure used, IP had regularly made payments relating to prior invoices submitted under the slaker contract. There was no evidence that, when Bennett changed the procedure used, it was so IP could avoid paying the invoices or not perform on the contract.

Additionally, in order to support the fraud finding, Signature was required to present evidence that all the elements of fraud as defined in the jury charge could be attributed to one employee of IP. *See Dynegy, Inc. v. Yates*, 345 S.W.3d 516, 531 (Tex. App.—San Antonio 2011), *rev'd on other grounds*, 422 S.W.3d 638 (Tex. 2013). Signature was unable to satisfy this requirement. Evidence was presented that Edwards and Bennett were the main IP representatives that made modifications, both orally and through e-mail, to the FCO submission procedure. At trial, Signature presented evidence that Shawhan refused to pay the disputed FCO invoices. However, Shawhan was not the IP representative who made the changes to the FCO submission procedure that Signature detrimentally relied on; it was Edwards and Bennett. Therefore, Signature failed to present proof that only one employee committed the fraud as required by the jury charge.

The evidence is legally insufficient to support the jury's finding that IP committed fraud against Signature. We sustain IP's second issue.

## D.      Promissory Estoppel

By its third issue, IP challenges the jury's finding regarding promissory estoppel. IP argues that Signature's promissory estoppel claim is based on IP's performance under the slaker contract, and it states that Signature cannot recover under a promissory estoppel theory because there was a valid, enforceable contact between the parties. We agree with IP.

"Promissory estoppel operates to enforce an otherwise unenforceable promise; '[i]t cannot replace an enforceable contract.'" *Superior Laminate & Supply, Inc. v. Formica Corp.*, 93 S.W.3d 445, 449 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (quoting *Vogel v. Travelers Indem. Co.*, 966 S.W.2d 748, 754 (Tex. App.—San Antonio 1998, no pet.)). A claim for promissory estoppel and a contract claim are mutually exclusive claims; a litigant cannot recover on one if it recovers on the other. *Doctors Hosp. 1997, L.P. v. Sambuca Hous., L.P.*, 154 S.W.3d 634, 637 (Tex. App.—Houston [14th Dist.] 2004, pet. abated).

Here, the jury awarded damages in favor of Signature under both a theory of breach of contract and promissory estoppel. We have already held the evidence was sufficient to support the breach of contract finding. Therefore, because there was a valid contract in place between the parties, Signature cannot recover under a theory of promissory estoppel. *See id.* We sustain IP's third issue.

### III.      SIGNATURE'S DAMAGES AWARDS

52

By its fourth and fifth issues, IP challenges the damages awarded to Signature. By its fourth issue, IP claims there is legally insufficient evidence to support the award of consequential damages based on testimony of Signature's expert. By its fifth issue, IP argues that a new trial should be granted because the jury awarded excessive actual and consequential damages to Signature based on the evidence presented.

## A.    Standard of Review

The standard of review for legal insufficiency is addressed in Section II(A). The standard of review for excessive damages is the factual sufficiency of the evidence. *See, e.g.*, *Ellis*, 971 S.W.2d at 406–07; *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (per curiam); *Miller v. Argumaniz*, 479 S.W.3d 306, 313 (Tex. App.—El Paso 2015, pet. denied). The court of appeals should employ the same test for determining excessive damages as for any factual sufficiency questions. *Ellis*, 971 S.W.2d at 406. When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Id.* at 406–07. We can set aside the verdict only if it so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* at 407. The court of appeals is not a fact finder and may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result. *Id.*

If the court of appeals determines that the evidence supports a jury's verdict, it is not required to detail all of the evidence supporting the judgment when it affirms the trial court's judgment for actual damages. *Id.* On the other hand, when reversing a trial court's

judgment for factual insufficiency, the court of appeals must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust. *Id.* The court of appeals must explain how the contrary evidence greatly outweighs the evidence supporting the verdict. *Id.*

## B.  Jury Question

Relating to the breach of contract claim, question number 1(c) of the jury charge stated the following regarding damages:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Signature for its damages, if any, that resulted from IP's failure to comply?
>
> . . .
>
> Answer separately in dollars and cents for damages, if any.
>
> (1)    The difference, if any, between the payment Signature received from IP for its work and the payment Signature would have received from IP if IP had complied with the agreements.
>
> Answer:      $2,442,515.28
>
> (2)    Damages to Signature's company value, if any, that were a natural and probable consequence of such failure to comply, and that were foreseeable to Signature and IP when the agreements were made.
>
> Answer:      $56,284,633.00

## C.  Actual Damages

To recover damages for breach of contract, a plaintiff must show that he suffered a pecuniary loss as a result of the breach. *AZZ Inc. v. Morgan*, 462 S.W.3d 284, 289 (Tex. App.—Fort Worth 2015, pet. ref'd). "Such losses must be the natural, probable, and

foreseeable consequence of the defendant's conduct." *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 64 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). A plaintiff may not recover breach-of-contract damages if those damages are remote, contingent, speculative, or conjectural. *Id*. Generally, the measure of damages for breach of contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed. *AZZ*, 462 S.W.3d at 289.

Although the amount owed under the disputed invoices was a hotly contested issue throughout trial, the jury sided with Signature and awarded the $2.4 million Signature claimed it was owed. Signature introduced thousands of pages of documents into evidence for the jury to review and determine the proper amount of money Signature was owed. Although IP argues that Signature admitted it was owed less than $2.4 million and the slaker project invoices do not add up to $2.4 million, the jury also was allowed to consider non-slaker projects as part of the breach of contract questions.

We have considered and weighed all of the evidence, not just that evidence which supports the verdict. *Ellis*, 971 S.W.2d at 406–07. However, we cannot say that based on all of the evidence presented that the finding of $2.4 million in breach of contract damages is clearly wrong and unjust. *Id*. at 407. The jury is the sole factfinder and we defer to its finding, even if the evidence would support a different result. *Id*. at 407. Additionally, to the extent IP makes a legal sufficiency argument as to the actual damages award, based on the evidence presented we cannot say the evidence was less than a scintilla or no evidence. *See City of Keller*, 168 S.W.3d at 810; *Pena*, 548 S.W.3d at 90. We must show deference to the jury's resolution of conflicts in the evidence, and we must presume that

the jury resolved all conflicts in favor of the verdict. *See City of Keller*, 168 S.W.3d at 820–21. Therefore, we overrule IP's fifth issue as it relates to the award of actual damages.

## D.  Consequential Damages

IP's challenge to the consequential damages relates to Question 1(c)(2)'s answer. Consequential damages result from the defendant's wrongful acts. *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Foreseeability is a fundamental prerequisite to the recovery of consequential damages for breach of contract. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011). Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts. *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (per curiam). Consequential damages are generally not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. *Id.*; *AZZ*, 462 S.W.3d at 289.

Coker testified that he determined the amount suggested as damages by totaling three figures: (1) $42 million, representing the Primoris offer; (2) $12,431,501, representing the owners' equity loss; and (3) $1,853,132, representing the IRS penalties Signature incurred. The jury's consequential damages award equaled the amount Coker recommended: $56,284,633. IP argues that Coker's testimony was not probative because he "assumed" certain facts; Signature, as a company, was not able to recover company value[14] and there was no evidence of foreseeability to support the damages award.

---

[14] The case IP references in its brief for this argument relates to "lost profits" and market value in a land condemnation case, *State v. Luby's Fuddruckers Restaurants, LLC*, 531 S.W.3d 810 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). We do not find the analysis on point for this case.

56

"When an expert opinion is admitted into evidence without objection, 'it may be considered probative evidence even if the basis for the opinion is unreliable.'" *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 828 (Tex. 2009)). "But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Pollock*, 284 S.W.3d at 828. "This is because the evidentiary value of expert testimony is derived from its basis, not from the mere fact that the expert has said it." *Hous. Unlimited*, 443 S.W.3d at 829.

Coker explained during his testimony that he came to his determination that Signature was worth $42 million based on the Primoris offer. He testified that a "bona fide offer" is what one "should consider the value of the company" to be because the offer was from a "knowledgeable buyer." However, in order to award consequential damages based on the Primoris offer, the jury was required to find that the offer was "foreseeable" at the time the agreement was made. Moreno testified that Signature and Primoris began discussions in early 2014 and the first letter of intent was issued in May 2014, after the slaker project was completed. Moreno also said he did not have a conversation with IP about the possible acquisition and was not aware that anyone else from Signature told IP either. Michalk testified that negotiations between Signature and Primoris were confidential in 2014. There was no evidence presented that IP had any knowledge of the attempted sale of Signature at the time the agreement was made. Therefore, the $42

million in consequential damages resulting from the failure of the Primoris transaction is not supported by legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 810.

Coker also testified that, although IP does not have to pay the IRS taxes for Signature, he felt it was responsible for the interest—he explained that Signature was unable to pay the taxes when they were due because IP had not paid the disputed invoices. However, the evidence showed that Signature was behind on its payroll taxes as early as 2013 and no slaker contract invoice had become due at that point. Coker testified that he used figures from documents Signature provided to him, instead of determining the figures himself. Ogden also testified that even though Signature had been behind on payroll taxes in 2013, it had "caught up" on the delinquent payroll taxes as of 2014 before the slaker project began. Still, there was no evidence that IP would have "foreseen" that Signature would use the money it withheld for payroll taxes to pay its other financial requirements. Therefore, the jury's award of $1,853,132 in IRS penalties was not supported by legally sufficient evidence. *See id.*

Coker also explained how he determined the owners' equity shares which the jury included in its damages award. Coker stated that if one takes the actual net worth of a company and subtracts its liabilities, the remainder equals the owners' equity. Coker testified that he determined the owners' equity numbers by comparing a December 31, 2013 balance sheet with the March 11, 2016 pro forma closing sheet.[15] IP countered with its expert, Domercq, who felt that that Coker's determinations regarding the disputed

---

[15] Testimony showed that Coker identified the pro forma balance sheet as an indication of "what you think it's going to be." IP asked if it was an "estimated or projected balance sheet" and not an actual number, to which Coker responded in the affirmative.

invoices and owners' equity numbers were incorrect. Domercq explained that Coker did not consider any other factors that could have contributed to Signature's financial condition other than the disputed unpaid invoices.

However, the jury could have also considered other testimony to arrive at its award for the owners' equity numbers. Wilhelm testified that Signature lost work, including projects with Valero, due to the situation that arose between Signature and IP, which called into question Signature's financial status. *See Hoppenstein Props., Inc. v. McLennan Cnty. Apprisal Dist.*, 341 S.W.3d 16, 21 (Tex. App.—Waco 2010, no pet.) (providing that profits that plaintiff would have realized under contract between parties are direct damages, while profits plaintiff would have realized on other contracts are consequential damages). Ogden testified that Signature's reputation suffered in the industry because Signature's finances deteriorated, and it was unable to pay vendors and subcontractors due to the unpaid invoices. Additionally, there was testimony presented that Signature had struggled financially in 2013 due to a previous accident that occurred on a job with Exxon, which reduced its work during the investigation. Ogden explained that Signature lost about five months of jobs and revenue until it was exonerated in the Exxon accident. Testimony spoke of how "word" spreads in the industry, and Signature's business was impacted by the accident according to Signature's witnesses.

Coker stated that he did not perform any independent market value analysis of Signature—instead, he relied on Primoris's market value analysis done in April or May 2014, and he looked at existing financial statements and the pro forma closing sheet to determine the equity amounts. Nevertheless, there was more than a scintilla of evidence

59

to support his determination that the owners lost $12.4 million in equity based on the evidence presented by Coker and other witnesses. *See City of Keller*, 168 S.W.3d at 810; *Ridgway*, 135 S.W.3d at 601. The jury could consider both Coker's testimony and any other witnesses that presented testimony regarding the issues Signature faced due to the unpaid disputed invoices. *See Stuart*, 964 S.W.2d at 921. The jury could have inferred that IP knew that the delay in paying invoices or refusing to pay invoices would cause Signature to struggle financially and IP would have been able to foresee the results that came about. *See id.*

Moreover, Coker explained how he determined the owners' equity amounts of $3 million and $-9 million and the jury also heard additional testimony about Signature's financial status throughout the time period in question. Because it was foreseeable that not paying invoices to a company who had struggled financially in the year before would cause major financial issues, the $12,431,501 consequential damages award was supported by sufficient evidence. *See id.*

Therefore, we overrule that part of IP's fourth issue regarding the owners' equity damages and sustain the remainder of the issue.

## IV. SUFFICIENCY OF THE EVIDENCE RELATED TO OGDEN'S CLAIMS

By issues six and seven, IP challenges the sufficiency of the evidence to support Ogden's claims.

## A. Standard of Review

We follow the same standard of review as laid out in Section 2A relating to Signature's breach of contract claims.

**B.      Assignment of Rights and Breach of Contract**

The benefits and burdens of a contract belong solely to the contracting parties, and no person can sue upon a contract unless he is a party to it or in privity with it. *First Bank v. Brumitt*, 519 S.W.3d 95, 104 (Tex. 2017). An exception to this general rule permits a person who is not a party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary or an assignee. *See id.*; *Brown v. Mesa Distribs., Inc.*, 414 S.W.3d 279, 284 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

An assignment is a manifestation by the owner of a right of his intention to transfer such right to the assignee. *Brown*, 414 S.W.3d at 284. Unless qualified, the assignment is a transfer of one whole interest. *See Concierge Nursing Ctrs., Inc. v. Antex Roofing, Inc.*, 433 S.W.3d 37, 45 (Tex. App.—Houston [1st Dist.] 2013, pet denied). Following an unqualified assignment, the assignor loses all rights to enforce the contract. *See Mobil Oil Corp. v. Tex. Commerce Bank-Airline*, 813 S.W.2d 607, 609 (Tex. App.—Houston [1st Dist.] 1991, no writ). Any right to performance by the assignor is extinguished. *See id.*

In order to establish standing to maintain a breach of contract action, a plaintiff must either show it had third-party-beneficiary status or privity with a party to the contract. *Brown*, 414 S.W.3d at 284. Privity is established by proof that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff. *Id.* at 284–85.

Whether a third party may sue to enforce the parties' agreement depends not on whether the third party will benefit or on whether the parties knew that the third party would benefit, but on whether the contracting parties "intended to secure a benefit to [a]

61

third party" and "entered into the contract directly for the third party's benefit." *First Bank*, 519 S.W.3d at 104 (quoting *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam)).

To determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, courts must look solely to the contract's language, construed as a whole. *Id.* at 102. The contract must include a "clear and unequivocal expression of the contracting parties' intent to directly benefit a third party" and any implied intent to create a third-party beneficiary is insufficient. *Id.* (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

The contract between Signature and IP stated:

Article 23.   LIMITATIONS       ON       ASSIGNMENT       AND
              SUBCONTRACTORS:

CONTRACTOR [Signature] shall not assign the AGREEMENT, its rights or obligations, without the prior written consent of COMPANY [IP], no[r] shall CONTRACTOR assign any money due or to become due without the prior written consent of COMPANY. Nothing in the AGREEMENT shall create any contractual relation between any subcontractors and COMPANY, and CONTRACTOR agrees that it is fully responsible to COMPANY for the acts and omissions of subcontractors.

The contract is unambiguous that Signature did not have the right to assign its claims to Ogden without IP's approval. However, even if Signature did have the unrestricted right to assign its claims under the contract, it would lose its right to sue for breach of contract upon assignment. *See Mobil Oil Corp*, 813 S.W.2d at 609. Signature did not argue it gave up its rights under the contract to allow Ogden to sue; instead, it and Ogden both sued under the same argument. Ogden based his breach of contract claims on Signature's breach of contract claims. But both entities cannot be entitled to pursue a

breach of contract claim against IP. *See id.* Signature also had no claim to pursue for Ogden's personal damages, so that would be a claim it would be unable to assign. At best, Signature could have assigned Ogden its claims for breach of contract, but based on the allegations argued in the lawsuit, it did not.

Although Ogden argued that IP did not preserve the issue because there was no jury question regarding Ogden's breach of contract claims and the jury was allowed to decide if Signature assigned the right to sue for Ogden's personal damages, the evidence is legally insufficient to support Question 4(a). It is apparent that Signature did not intend to assign its rights to Ogden, as it continued to pursue its own breach of contract allegation against IP. *See id.* We sustain IP's sixth issue.

Since we hold that Signature did not properly assign its breach of contract rights to Ogden, the damages awarded to Ogden under Question 4(c) related to breach of contract must be reversed.

## C.     Fraud

Ogden's fraud claim is also linked to Signature's claims, and we have decided that Signature's fraud claims were supported by legally insufficient evidence. The jury charge contained the same elements for fraud as in Signature's claims but additionally included the following:

> A party commits fraud indirectly when it makes false representations to a third party with the intent that it be repeated to deceive the injured party or makes a false representation with information that would lead a reasonable man to conclude that there is an especial likelihood that it would reach the injured party and would influence the injured party's conduct.

63

There was no evidence presented that IP made any statements knowing affirmatively that Ogden would individually rely on them. We previously found that the evidence was insufficient to support a fraud finding because Signature did not prove that a "single employee" committed all the elements of fraud within the scope of his employment. Here, there was no evidence presented that any single IP employee made misrepresentations to Signature intending for Ogden to act on them. *See Dynegy, Inc.*, 345 S.W.3d at 531. We sustain IP's seventh issue.

Since we hold that Ogden's fraud claim is supported by legally insufficient evidence, the damages awarded to Ogden under Question 5(b) related to fraud must be reversed. Ogden was also awarded mental anguish damages due to the finding of fraud, which must also be reversed. We sustain IP's eighth issue.

## V. IP'S EXPERT WITNESS TESTIMONY

By its ninth issue, IP alleges that the trial court abused its discretion when it excluded testimony from IP's expert, Byrd, on the ground that his testimony was cumulative. We assume, but do not decide, that the trial court erred by excluding Byrd's testimony. We proceed to evaluate whether the error is reversible. *See* TEX. R. APP. P. 44.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals.").

A judgment may not be reversed unless the error "can be said to have contributed in a substantial way to bring about the adverse judgment." *Lorusso v. Members Mut. Ins.*,

603 S.W.2d 818, 819–20 (Tex. 1980) (citing *King v. Skelly*, 452 S.W.2d 691, 696 (Tex. 1970)). This rule is based on our understanding that "a litigant is not entitled to a perfect trial for, indeed, few trials are perfect." *Id.* at 819. The determination of whether the error probably caused the rendition of an improper judgment "necessarily is a judgment call entrusted to the sound discretion and good senses of the reviewing court." *McCraw v. Maris*, 828 S.W.2d 756, 759 (Tex. 1992), and we have recognized "the impossibility of establishing a specific test for determining harmful error." *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 145 (Tex. 2016) (citing *State v. Cent. Expressway Sign Assocs.,* 302 S.W.3d 866, 870 (Tex. 2009)); *see also Lorusso*, 603 S.W.2d at 821 (citing *Standard Fire Ins. v. Reese*, 584 S.W.2d 835 (Tex. 1979)).

The role excluded evidence plays in the context of trial is important, and the supreme court has provided guidelines to assist trial courts in applying the reversible error standard. *See Cent. Expressway Sign Assocs.,* 302 S.W.3d at 870. Exclusion is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id.* By contrast, exclusion of the evidence is likely harmful if it was "crucial to a key issue." *Id.*

Thus, in determining whether the exclusion of evidence was harmful, we must review the entire record and we apply the same standard—whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018).

IP argues that Byrd's testimony was crucial because it rebutted Signature's evidence presented about piping drawings. However, multiple witnesses testified about the drawings prior to Byrd. Although piping was an issue discussed in terms of whether it was included in Signature's original bid, we conclude that excluding Byrd's more technical testimony did not cause the rendition of an improper judgment. *See id.*

Piping, its inclusion or lack thereof in the original bid, and its costs in the disputed invoices was one of many expenses IP challenged. The jury accepted the full amount of the disputed invoices that Signature claimed. Therefore, it is unlikely that Byrd's testimony would have swayed the jury in such a manner that the judgment would be different. *See id.* Additionally, multiple witnesses testified about the piping, drawings, re-drawings, and issues regarding mistakes throughout the weeks-long trial. We find it unlikely that Byrd's testimony would have changed the outcome of the jury's decision and we overrule IP's ninth issue.

## VI.    INDEMNITY

By its tenth issue, IP argues the trial court committed reversible error by refusing to enforce Signature's duty to indemnify.

The slaker contract contained an indemnity provision that stated: "In the event the liability of the CONTRACTOR [Signature] shall arise by the reason of the sole negligence of COMPANY [IP], then and only then, the CONTRACTOR shall not be liable under the provisions of this paragraph." The claims raised during trial solely related to what Signature and Ogden claimed was IP's negligence.

66

Here, within the four corners of the contract, the language specifically stated that Signature would not be liable under the indemnification section if liability arose by reason of "the sole negligence of" IP. The lawsuit arose because IP did not pay the disputed invoices, and that disagreement is what gave rise to Ogden's claims against IP. Because Ogden's damages were due to the actions of IP, Signature was not required to indemnify IP for the costs it incurred defending against Ogden. We overrule IP's tenth issue.[16]

## VII.  CONCLUSION

In summary, we overrule IP's issue regarding Signature's breach of contract claim and its challenge to the breach of contract actual damages. We affirm the trial court's judgment as to actual damages.

We sustain IP's issues related to Signature's fraud and promissory estoppel claims. We reverse the trial court's judgment as to fraud and promissory estoppel claims and render judgment that Signature take nothing by way of those claims.

We further hold there is legally insufficient evidence to support the consequential damages award of $42 million for the lost sale opportunity and $1,853,132 million in IRS penalties. We reverse and render judgment that Signature take nothing by way of its request for damages arising from the loss of the Primoris sale and IRS penalties. Additionally, we affirm the consequential damages relating to the owners' lost equity in the amount of 12,431.501.

---

[16] IP's eleventh issue is relevant only if any of Ogden's claims survived our review. Because we sustained IP's issues as to all of Ogden's claims, this issue is now moot and we do not address it. *See* TEX. R. APP. P. 47.1.

We also sustain IP's issues related to Ogden's claims for breach of contract and fraud. We reverse the portion of the trial court's judgment awarding damages to Ogden under those causes of action, and we render a take-nothing judgment on behalf of IP.

GINA M. BENAVIDES,
Justice

Delivered and filed the
30th day of April, 2020.